834 So.2d 1003 (2002)
STATE of Louisiana
v.
Phillip Lynn KARAM.
No. 02-0163.
Court of Appeal of Louisiana, Third Circuit.
July 31, 2002.
*1006 Michael Cade Cassidy, District Attorney, Thirty-First Judicial District Court, Jennings, LA, for Appellee, State of Louisiana.
G. Paul Marx, Lafayette, LA, for Appellant/Defendant, Phillip Lynn Karam.
Court composed of MARC T. AMY, MICHAEL G. SULLIVAN and ELIZABETH A. PICKETT, Judges.
AMY, Judge.
The defendant was convicted of three counts of first degree murder and subsequently sentenced to three consecutive sentences of life imprisonment without the possibility of probation, parole, or suspension of sentence. The defendant appeals. For the following reasons, the defendant's convictions are affirmed. Due to an error in the order of restitution, the defendant's sentences are vacated and this matter is remanded for resentencing.

Factual and Procedural Background
The record indicates that on February 5, 2000, between 9:30 and 9:40 p.m., a 911 telephone call was received by the Jefferson Davis Parish Sheriff's Department. The dispatcher testified that the caller did not speak during the call, but that moaning could be heard. The dispatcher believed the telephone call to be medical in nature and sent assistance to the location of the telephone call, 1607 North Cutting Street, Jennings, Louisiana. She testified that in addition to sending medical personnel to the location, she also dispatched area patrol units.
When officers arrived at the scene, they recognized or learned that the residence was that of Kenneth and Christine Guidry. Kenneth Guidry was a retired Jennings Police Department Captain. Sergeant Colin Ray Richard testified that he knew Christine was battling cancer and felt that they might be responding to a request for assistance related to her illness.
Officers Johnny Lassiter, Doug Murry, and Burt LeBlanc approached the carport door of the residence. According to Officer Lassiter, Officer LeBlanc either knocked on the carport door or rang the doorbell. Officer Lassiter explained that he heard the defendant, Phillip Karam, walking down the hall and muttering. The record indicates that the responding officers *1007 were familiar with the defendant as he, too, is a former Jennings Police Officer. Officer Lassiter testified that he knew the defendant and Kenneth Guidry were friends and, thus, he was not surprised to hear the defendant's voice at the Guidry home. According to Officer Lassiter, when the defendant opened the door, Officer LeBlanc asked, "What's the deal, Phil?" Officer Lassiter explained that the defendant responded: "Yeah, I did them both." Officer Murry, who was also at the door, testified that the defendant stated: "[T]hey're both dead or something to that fact." Another officer, Officer Richard Broussard, testified that the defendant had a smile on his face when he answered the door. According to the officers present, the defendant then pulled a gun and began shooting. Officer Lassiter was shot in his arm while Officer LeBlanc was shot in his chest. Several shots were fired; two of the officers testified that they heard approximately five or six shots fired. Although Officer LeBlanc was attended by the other officers and medical personnel, his chest wound was fatal.
The defendant retreated to the backyard of the Guidry home, while the officers secured the area and the neighborhood. Due to the "standoff" situation, officers were unable to immediately enter the residence to check on the condition of the Guidrys. After a period of approximately two hours and after encouragement from police officers, the defendant walked to the driveway where he was arrested. According to Sergeant Richard, when he entered the home, he saw blood spatters on the kitchen floor, unspent rounds, and the body of Kenneth Guidry. Sergeant Richard found Christine Guidry lying face down in the hallway. Mrs. Guidry was found with the telephone in her hand.
On March 21, 2000, a grand jury indicted the defendant with three counts of first degree murder, violations of La.R.S. 14:30. The defendant was arraigned twice on these charges and, on both occasions, he entered pleas of not guilty by reason of insanity. On May 18, 2001, defense counsel orally requested appointment of a sanity commission, which he followed with a written request on May 25, 2001. On June 13, 2001, a competency hearing was held and the trial court found the defendant capable of proceeding to trial.
On August 2, 2001, the defendant was convicted by a jury of three counts of first degree murder.[1] Although the State pursued the matter as a capital case, the jury reached an impasse regarding the appropriate sentence. On August 17, 2001, the trial court sentenced the defendant on each of the three counts to life imprisonment without benefit of parole, probation, or suspension of sentence, to run consecutively. Additionally, the trial court ordered the defendant to pay counseling costs for the victims' families. The defendant was also assessed with court costs. The trial court ordered that the maximum amount allowed by law be deducted from any income of the defendant, with counseling costs to be deducted first. Finally, the weapon used in the commission of the crimes was ordered forfeited to the Jennings Police Department.
The defendant appeals his convictions, advancing the following assignments of error:
1. The trial court erred in that it admitted statements of the defendant that were neither inculpatory nor otherwise *1008 admissible under any exception to the hearsay rule.
2. The verdict is contrary to the law where the petit jury venire was not selected in accord with Article 408 of the Code of Criminal Procedure, in that the venire box was not sealed and locked as mandated by law.
3. Trial court erred in refusing to grant a mistrial and in failing to grant [a] motion for new trial where the prosecutor argued that the defense had failed to "do its job" and thereby created an inference that the defendant had a burden to prove innocence in this case.
4. Trial court erred in that it ordered a general amount of restitution and costs, which is an error patent and must be subject to correction or reversal since only the trial court can set the amount of restitution, cost or penalties.
5. The verdict is contrary to law in that the evidence was insufficient to exclude the reasonable hypothesis of innocence and did not establish sufficient facts for proof of Attempted [sic] First Degree Murder beyond a reasonable doubt.
6. The trial court erred in that certain items of evidence were admitted without a sufficient chain of custody being established by the State.
7. The trial court erred in that hearsay attachments to the autopsy were entered into evidence despite the character of the documents as hearsay and the failure of the State to provide timely discovery to the defense.
8. The trial court erred in admitting the police report over objection where the witness could not recall the details of the report and where attempts to refresh his recollection were unsuccessful.

Discussion
Errors Patent
As is required by La.Code Crim.P. art. 920, we have reviewed this matter for errors patent on the face of the record. In addition to a sentencing error raised by the defendant and addressed below in our discussion of the defendant's assignments, our review reveals one additional patent error.
Upon request by the defendant, a sanity commission was appointed on May 25, 2001. The defendant was found competent to proceed to trial on June 13, 2001. After the appointment of the commission, but prior to its determination, hearings were held on several motions, including the request to hire experts, the question of the presence of police officers in the courtroom during trial, and a motion to hire a local attorney.
La.Code Crim.P. art. 642 provides, in part, that: "When the question of the defendant's mental incapacity to proceed is raised, there shall be no further steps in the criminal prosecution, except the institution of prosecution, until the defendant is found to have the mental capacity to proceed." Although the hearing was held in error in this case, we conclude that any error was harmless. See State v. Young, 576 So.2d 1048 (La.App. 1 Cir.), writ denied, 584 So.2d 679 (La.1991).
In State v. Calais, 615 So.2d 4, 5 (La. App. 3 Cir.), writ denied, 617 So.2d 1180 (La.1993), a panel of this court explained that the stay of proceedings described in Article 642 ensures "that no action prejudicial to the defendant will be taken until the defendant's capacity to understand the nature of the proceedings and to assist in his defense has been established." In addition to the type of motions heard by the trial court prior to the opinion of the sanity commission, which were primarily those filed by the defendant's counsel and which were generally resolved in his favor, we point out that these hearings were pretrial in nature.
*1009 Sufficiency of the Evidence
The defendant concedes that he shot the victims in this case. However, with regard to the deaths of Kenneth and Christine Guidry, the defendant contends that the evidence was insufficient to establish that he had the specific intent to kill more than one person and, accordingly, insufficient to convict him of first degree murder under the theory advanced by the State. In his brief to this court, the defendant claims:
The proof in the Court below with regard to Counts 1 and 2 (the Guidrys) is lacking in the specific detail that would establish First Degree Murder. There was, in fact, no evidence of what happened before law enforcement arrived. While there was ample testimony regarding the shooting of Officer Burt LeBlanc, based on eyewitness testimony, no testimony was presented to indicate the nature of the shootings inside the residence.
(Record citations omitted.) He claims that, at most, the evidence supports verdicts of second degree murder. Although the defendant was also convicted of first degree murder in the death of Officer Burt LeBlanc, he does not contest the sufficiency of the evidence as to that conviction.
Insofar as it relates to the facts of this case, La.R.S. 14:30 provides the following definition of first degree murder:
A. First degree murder is the killing of a human being:
....
(2) When the offender has a specific intent to kill or to inflict great bodily harm upon a fireman, peace officer, or civilian employee of the Louisiana State Police Crime Laboratory or any other forensic laboratory engaged in the performance of his lawful duties, or when the specific intent to kill or to inflict great bodily harm is directly related to the victim's status as a fireman, peace officer, or civilian employee.
(3) When the offender has the specific intent to kill or to inflict great bodily harm upon more than one person; or
La.R.S. 14:10(1) defines specific criminal intent as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." In discussing specific intent in the context of La.R.S. 14:30(A)(3), the Louisiana Supreme Court has stated:
This intent has been defined by this court as requiring an offender to contemplate and actually cause the death of one person and the risk of death or great bodily harm to at least one other person by a series of acts during a single criminal episode or transaction.
State v. Broaden, 99-2124, p. 19 (La.2/21/01); 780 So.2d 349, 369 (citation omitted), cert. denied, 534 U.S. 884, 122 S.Ct. 192, 151 L.Ed.2d 135 (2001).
On review, we consider the defendant's insufficiency of the evidence claim in light of the standard set forth in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The Jackson standard of review requires consideration of whether a rational juror could find all elements of the offense proven beyond a reasonable doubt when viewing evidence in a light most favorable to the State. Id.
The State presented the testimony of Troy Sonnier, a Jennings resident, who explained that on the evening of February 5, he was traveling on North Cutting Street and had to avoid hitting an individual crossing the road. He identified the individual as the defendant. Mr. Sonnier explained that he recognized the defendant from his previous employment at an auto parts store in Jennings. He testified that after he swerved to miss the individual, he *1010 glanced at his clock and noted the time to be 9:30 p.m. Deputy Mary Katherine Williams of the Jefferson Davis Parish Sheriff's Department testified that she was on duty that evening, working communications, when she received the 911 telephone call from the North Cutting address between 9:30 and 9:40 p.m. From this short period of time between identification of the defendant proceeding on North Cutting Avenue and the 911 telephone call from the residence, on which only moaning sounds could be heard, the jury was free to conclude that the defendant entered the home with the intent to kill Mr. and Mrs. Guidry. The jury could have concluded that an insufficient interval existed for any other explanation for the shootings.
Furthermore, the jury was aware of the circumstances of the shootings. Dr. Terry Welke, the coroner who performed the autopsies, testified that Christine's death was caused by a gunshot wound to the trunk. The bullet entered the outer portion of her left shoulder, traveled through her arm and entered her chest. According to Dr. Welke, the trajectory suggests that Christine was shot from the side, rather than from the front. He also stated that he did not locate any soot on Christine's body, leading him to conclude that the gun was at least two and one-half to three feet away from her when it was discharged. Dr. Welke found abrasions on Christine's knees and concluded that they were simultaneous with her death. He explained that he thought Christine either skidded or dragged herself prior to collapsing.
Dr. Welke testified that the cause of Kenneth Guidry's death was two gunshot wounds, one to the head and one to the trunk. He described the trajectory of the bullet to the head as being from the front of the head towards the back and "from the top downwards." The trajectory of the bullet to the trunk was from the front portion of the body to the back portion of the body and slightly downwards. Dr. Welke also stated that both shots fired at Kenneth were fired at a distant range, "meaning somewhere beyond two-and-a-half to three feet ..." Dr. Welke described Kenneth as being 5'8" in height. Due to this height, Dr. Welke opined, it would be hard for someone to inflict a gunshot wound to the top of his head if he was standing straight up. Dr. Welke agreed that Kenneth could have been leaning over or sitting and leaning over. Dr. Welke also opined that the bullet in Kenneth's spine would have immobilized him at least temporarily.
The jury was also aware of the testimony of Officer Johnny Lassiter of the Jennings City Police Department, who followed Officers Murry and LeBlanc to the carport door. He testified that he heard the defendant coming down the hallway of the home, that he recognized the defendant's voice, and that Officer LeBlanc asked him, "What's the deal, Phil." Officer Lassiter explained that the defendant responded: "Yeah, I did them both."[2] According to Officer Lassiter, the defendant then began firing on the police officers. Further, Officer Richard Lovell, who transported the defendant from the scene to the police station, testified that during the transport, the defendant inquired: "Well, who else did I kill today besides Kenneth and Christine, of course?"
Considering the evidence of the late evening time period of the murders and the defendant's relationship with the victims, the jury was free to conclude that the defendant entered the home knowing that both Kenneth and Christine were home.
*1011 The jury was also aware of the short time period between his identification on the street and the call placed to 911, i.e., the jury was free to conclude that this time period demonstrated that he entered the home with intent to kill. Furthermore, the State presented evidence of the distance from which the shots were fired and the trajectory at which the bullets traveled, evidence which the jury could have viewed as excluding a hypothesis that the bullets had been fired in self-defense. Finally, the jury heard from witnesses who offered statements possibly revealing insight into the defendant's state of mind. We conclude that the presence of this evidence supports the jury's determination under the Jackson standard.
We are mindful of the role of circumstantial evidence in the State's prosecution of these offenses. In the event a conviction is based on circumstantial evidence, La.R.S. 15:438 instructs the factfinder that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." On review, the supreme court has explained that:
[T]he reviewing court "does not determine whether another possible hypothesis suggested by a defendant could afford an exculpatory explanation of the events." State v. Davis, 92-1623 (La.5/23/94), 637 So.2d 1012, 1020. Rather, the court must evaluate the evidence in a light most favorable to the state and determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. Id.

State v. Mitchell, 99-3342, p. 7 (La.10/17/00); 772 So.2d 78, 83.
In the defense's opening statement, counsel stated: "We believe that Phil shot Kenny first and that perhaps maybe Christine was hit by a stray bullet `cause there is only (1) bullet that struck Christine and it entered her arm, traversed her chest cavity, came out the side, hit her other arm and fell to the ground (indicating)." After Christine was shot, defense counsel suggested, she went to the hallway with her portable telephone and called 911. In his closing argument, defense counsel expanded the argument by proposing that if the defendant intended to kill Christine, he would not have shot her in the arm. Additionally, defense counsel stated:
No intent whatsoever to kill Christine. Something happens between Kenny and Phil. Phil picks up the gun off the cabinet, off the table. Kenny sees him. Kenny's lunging for his gun. Two (2) shots, one (1) in the stomach. Kenny falls forward. Another in the head. A third shot just goes wild and hits Christine in the arm. She could have lived as much as twenty (20) minutes Dr. Welke said. But if Phil is intent on assassinating people, he could have very easily just walked up to her, and as Mr. Cassidy said, assassinated her, shot her, murdered her. This is not a murder.
In State v. Laws, 95-593, p. 3 (La.App. 3 Cir. 12/6/95); 666 So.2d 1118, 1121, writ denied, 96-0089 (La.9/13/96); 679 So.2d 102, a panel of this court stated the following regarding reasonable hypotheses of innocence presented by a defendant: "If a case involves circumstantial evidence, and a rational trier of fact reasonably rejects the defendant's hypothesis of innocence, that hypothesis fails; and unless another one creates reasonable doubt, the defendant is guilty. State v. Captville, 448 So.2d 676 (La.1984)." Having reviewed the evidence, and given the short time frame advanced by the State and indication *1012 that the shots were not defensively fired, we find no error in the jury's rejection of the above hypotheses.[3]
This assignment lacks merit.
Admissibility of Statements
The defendant contends that several statements found admissible by the trial court constitute hearsay and should have been found inadmissible "at the basic level of analysis for admissibility of any evidence." Those statements are set forth in the following paragraph in the defendant's brief to this court:
On the road from the crime scene to the Jennings Police Department, Karam reportedly said "... who did I kill besides Kenny and Christine? Y'all can't talk to me?" At the station the comment was supposedly "... put a bullet in my head and get it over with." Another witness said Appellant asked him to scratch up his gun, fake a struggle, and "shoot me in the head". There was also testimony that the Appellant threatened another officer, saying "I should have done you ..." and that he suggested he hoped he hadn't killed an officer in the line of duty. Finally, the State offered a statement by the Appellant that he shouldn't be in jail with "general population" because he would "kill every S.O.B. in there."
(Record citations omitted.)
The above statements were the subject of pretrial, written motions to suppress which questioned their admissibility on the grounds of voluntariness, not on the basis of hearsay or relevance. Neither were these statements specifically objected to at trial on the basis of hearsay or relevance.
Although the defendant did not challenge the above statements as hearsay at the suppression hearings, defense counsel touched upon the relevancy of the statements in which the defendant asked an officer to put a bullet in his head and "get it over with" and when the defendant told an officer that he had messed up and that the officer needed to take his gun, scratch it up and shoot him in the head. In finding these statements admissible, the trial court explained: "The defense's argument is essentially that these statements may not be inculpatory, but as the Court pointed out, I think thatthat really would be a matter for the jury to determine after hearinghearing these statements." The judge ruled the statements were admissible at trial.
A defendant is limited to review of the grounds for objection which were raised at trial. La.Code Crim.P. art. 841.[4]State v. *1013 Guidry, 94-678 (La.App. 3 Cir. 12/7/94); 647 So.2d 502, citing State v. West, 419 So.2d 868 (La.1982). As the defendant preserved only issues of relevance, and did so only with regard to two of the statements, our review is limited in this regard to the above two statements. La.Code Evid. art. 401 defines "relevant" evidence as that "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Article 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." In State v. Anthony, 98-0406, p. 16 (La.4/11/00); 776 So.2d 376, 387, the Louisiana Supreme Court stated that: "The trial court is given great discretion in determining whether evidence is relevant, and absent a clear abuse of discretion, rulings on relevancy of evidence should not be disturbed on appeal."
Our review of the foregoing statements, made at the police station shortly after the defendant's arrest, indicate that the statements were relevant to the jury's consideration of whether the defendant's level of intoxication precluded the presence of specific intent. As the defendant claimed the intoxication defense, the burden was on the defense to prove that he was intoxicated to the point of being unable to form the specific intent to commit the murders. See State v. Anderson, 98-492 (La.App. 3 Cir. 10/28/98); 721 So.2d 1006, writ denied, 98-2976 (La.3/19/99); 739 So.2d 781. Thus, we find no clear abuse of discretion in the trial court's determination that the statements' probative value outweighed any unfair prejudicial effect.
Sealing of the Jury Venire
The defendant next contends that the jury venire was not selected in accordance with La.Code Crim.P. art. 408 as the jury venire box was not sealed and locked. In his brief, the defendant asserts that the "clerk's assistant in charge of the jury could not testify that she was the only person with access to the computer code for security of the venire list while it was in digital form."
La.Code Crim.P. art. 408 states:
A. In parishes other than Orleans, the jury commission shall select impartially at least three hundred persons having the qualifications to serve as jurors, who shall constitute the general venire. A list of persons so selected shall be prepared and certified by the clerk of court as the general venire list, and said list shall be kept as part of the records of the commission. The name and address of each person on the list shall be written on a separate slip of paper, with no designation as to race or color, which shall be placed in a box labeled "General Venire Box."
B. After the jury commission has selected the general venire, it shall lock and seal the general venire box and deliver it to the clerk of court, as the custodian thereof. Alternatively, the list of persons so selected may be retained in a form suitable for use by a properly programmed electronic device commonly known as a computer.
C. The jury commission shall meet at least once every six months and when ordered by the court, and may meet at any time to select or supplement the general venire. The commission may select a new general venire at any meeting and shall do so when ordered by the court.
*1014 At the beginning of jury selection, defense counsel moved to quash the jury venire on the basis the jury box was not sealed in accordance with La.Code Crim.P. art. 408. Eliana DeFrancesch, the clerk of court in St. John the Baptist Parish, testified that juries are randomly selected from the voter registration and driver's license rolls by a computer program. The "pick tickets" generated by the computer program are placed in a box in the criminal division of the clerk's office, but the box is neither sealed nor locked. In this case, the pick tickets were generated Friday, July 13,[5] and to Ms. DeFrancesch's knowledge, the box had been in either her possession or the possession of the deputy clerk and no one had access to the box after that time. When later recalled by the State, Ms. DeFrancesch testified that the venire list was in a folder which had been locked in her office until Thursday of the previous week.
Brandi Lewis, a deputy clerk, testified that the pick tickets were given to her on Friday by her supervisor, Ms. DeFrancesch, and were put in the box. The box was not sealed and it was left on Ms. Lewis' desk until Monday morning. Ms. Lewis testified that she compared the pick tickets to the computer printout on Friday and Monday morning before the hearing and the only ones she removed from the box were those that had been excused by the court. To her knowledge, no one else had either taken names out of the box or placed names in the box.
Shortly after the break, the State recalled Ms. DeFrancesch as a witness, and she testified that she and a minute clerk are the only two people who have access to the computer program. Ms. DeFrancesch testified that it was her understanding from the company producing the selection program that access to the computer cannot be gained unless the user has a code. She explained that she did not know whether the computer would notify her if someone gained unauthorized entry.
In finding no merit to the defendant's challenge to the venire, the trial court considered La.Code Crim.P. art. 419, which states:
A. A general venire, grand jury venire, or petit jury venire shall not be set aside for any reason unless fraud has been practiced, some great wrong committed that would work irreparable injury to the defendant, or unless persons were systematically excluded from the venires solely upon the basis of race.
B. This Article does not affect the right to challenge for cause, a juror who is not qualified to serve.
The trial court explained as follows in denying the motion to quash the venire:
The court has listened very carefully to testimony of Madam Clerk and her employees, minute clerks who testified earlier and has reviewed the entire process that is being used here in this parish, and I am very thoroughly satisfied that the integrity of the jury venire that was selected specifically for this case has, in no way, been compromised, and I am satisfied that, when we begin to pick a jury for this particular case, we will be drawing at random from the list of jurors who remain qualified to serve as potential jurors and be questioned to serve as jurors in this particular case.
Now, [t]he Court also is mindful of Article 419 of the Code of Criminal Procedure, which is a very, very brief article. It reads: A general venire, grand jury venire or petit jury venire shall not be set aside for any reason unless fraud has been practiced, some great wrong *1015 committed that would work irreparable injury to the Defendant, or unless persons were systematically excluded from the venires solely upon the basis of race.
None of those factors have been established here in the hearings that we have had, and, for that reason, [t]he Court feels, in addition to the reasons previously given, that there is no basis for the Motion to Quash and is, accordingly, going to deny the Defense's Motion to Quash the Jury Venire selected for this particular case.
Our review of the hearing on this issue reveals no error in the trial court's conclusion that the factors of Article 419 were not satisfied. Ms. DeFrancesch and her employee testified regarding the method of selection from the computer program and their lack of knowledge of a breach of its integrity. Also, a copy of the list was generated by the clerk's office during a break in the hearing and compared to names in the pick card box by court personnel during a break in the hearing. Ms. DeFrancesch ultimately testified that the list supplied to the court was identical to the list previously certified and presented to the court.
This assignment lacks merit.
Improper Statement During Closing Arguments
The defendant next contends that the trial court erred in refusing to grant a mistrial and motion for new trial following the prosecution's statement during closing arguments that the defense failed to do its job. The defendant asserts that this comment was in violation of La.Code Crim.P. art. 774 and created an inference that the defendant was required to prove his innocence.
La.Code Crim.P. art. 774 provides:
The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.
The argument shall not appeal to prejudice.
The state's rebuttal shall be confined to answering the argument of the defendant.
The comment at issue, made during closing argument, is as follows:
The State has not tried to hide anything from y'all. Quite the contrary. The State told y'all what we were going to prove and we did our job.
Did the defense do theirs? Let's see. The defense said
Defense counsel entered an objection at this point and a bench conference, which was transcribed and is contained in the record, was conducted. The State pointed out that the defendant did not prove certain references made during opening statements. Defense counsel explained that the defendant was not obligated to put on any evidence and that opening statements are not evidence. The trial court cautioned the State to refrain from statements indicating that the defendant has an obligation to provide a defense. The defendant's motion for a mistrial was denied.
When the State resumed its argument, the prosecutor stated:
Once again, ladies and gentlemen, the defense has no obligation to present a defense, and the Judge has already instructed you on that. But if they claim insanity, if they claim intoxication, they have the burden of proving that. In their opening statement, they talked about the defendant being a combatin regular marine combat duty, picking up wounded marines, picking up dead marines. I didn't hear any evidence of that. That Christine was hit by a stray bullet. There's no evidence of that.

*1016 That Phil is upset and distraught, disturbed. I didn't hear any evidence of that. And when he says the officers at the door, picks up the gun and shoots towards them hoping, ladies and gentlemen, that they will return fire. Where is the evidence that indicates that? We will present evidence from a psychiatrist telling you of Phil's condition, of his experiences in Vietnam. Please listen to this lady. Where is their evidence of that?
In a motion for new trial, the defendant asserted that the trial court's denial of the motion for mistrial showed prejudicial error. The trial court denied the motion, finding the defendant failed to show prejudice.
On appeal, the defendant limits his challenge to the implication that the defense did not do its job, thereby suggesting that the defendant had an obligation to put on evidence. As can be seen above, the State indicated after the bench conference that the defense had no obligation to present a defense. Although the State referenced the defendant's burden with regard to the intoxication defense, the statement made was not an incorrect statement of law. See Anderson, 98-492; 721 So.2d 1006.[6]
Finally, even if the State exceeds the bounds of closing arguments, "the court will not reverse a conviction unless `thoroughly convinced' that the argument influenced the jury and contributed to the verdict." State v. Casey, 99-0023, p. 17 (La.1/26/00); 775 So.2d 1022, 1036 (citations omitted), cert. denied, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000). Having considered the comment and the context in which it was made, we find no error in the trial court's determination that neither a mistrial nor new trial was required.
Restitution and Costs
The defendant contends that the trial court erred in failing to specify the amount of restitution and costs. The defendant, noting that he has been determined to be indigent, contends that provisions for payment must be fixed and subject to his ability to pay. The defendant asserts that the sentence, as imposed, is illegally vague.
With regard to the defendant's contention that costs must be specified, La. Code Crim.P. art. 887 indicates that a defendant convicted of an offense is liable for costs of the prosecution, whether or not the costs are specifically assessed by the court. There is no provision, however, indicating that the court must specify the amount of court costs to be paid. Insofar as the defendant's argument relates to costs, it is meritless.
With regard to the amount of restitution, La.R.S. 46:1844(M)(1) provides:
If the defendant is found guilty, the court or parole board shall require the defendant to pay restitution to the appropriate party in an amount and manner determined by the court. In addition, the court or parole board may require the defendant to perform community service work in an amount and according to a schedule determined by the court.
As the trial court ordered restitution in the way of counseling costs, but failed to determine the "amount and manner" *1017 as is required by the above statute, we vacate the defendant's sentences and remand for resentencing so that the trial court may impose this portion of the sentence in accordance with La.R.S. 46:1844(M)(1).
Chain of Evidence
The defendant argues that the trial court erred in admitting certain items of evidence without a sufficient chain of custody being established by the State. The defendant claims that certain items were "neither subject to a chain of custody nor distinctive enough to be identifiable without it." The defendant further argues that none of the challenged items were "so unique as to be exempt from the requirement that a chain of custody be established to show the connection of the thing of the offense."
In State v. Cosey, 97-2020, p. 3-4 (La.11/28/00); 779 So.2d 675, 678, cert. denied, 533 U.S. 907, 121 S.Ct. 2252, 150 L.Ed.2d 239 (2001), the Louisiana Supreme Court stated the following with regard to demonstrative evidence:
To be admissible at trial, demonstrative evidence must first be identified. La. C.E. art. 901. Identification can be visual or by chain of custody of the object. State v. Landry, 388 So.2d 699, 704 (La. 1980), cert. denied, 450 U.S. 968, 101 S.Ct. 1487, 67 L.Ed.2d 618 (1981); State v. Overton, 596 So.2d 1344, 1354 (La. App. 1st Cir.), writ denied, 599 So.2d 315 (La.1992). The identification need not be absolute, certain or wholly unqualified. State v. Mills, 505 So.2d 933 (La.App. 2nd Cir.) (sufficient that a preponderance of evidence establishes that it is more probable than not, the evidence is connected with the case, "... the weight to be given to the evidence is a question for the jury."), writ denied, 508 So.2d 65 (La.1987).
In State v. Spencer, 95-208, 95-328, p. 3 (La.App. 3 Cir. 10/4/95); 663 So.2d 271, 273-74, a panel of this court explained that "a continuous chain of custody need not be established if the evidence as a whole shows, more probably than not, that the object introduced at trial is the same as the object originally seized, and any defects in the `chain' go to weight, not admissibility."
Deputy James Anthony Lohnes and Deputy Matthew Vezinot of the Calcasieu Parish Sheriff's Office, Crime Scene Division, testified that they were called to the scene and were responsible for the recovery of certain pieces of evidence. Several pieces of this evidence are questioned by the defendant in his brief to this court, as they were at trial.
First, the State offered into evidence State's Exhibit 26, a white ashtray with six empty 32-20 Winchester casings. Deputy Lohnes examined State's Exhibit 5B, a photograph of an ashtray with six spent rounds taken at the Guidry residence on the night of the murders, and stated that the photograph accurately reflects the ashtray in State's Exhibit 26. Defense counsel traversed the deputy, questioning whether the deputy was the one who actually took the ashtray into possession. The deputy said that he did take the ashtray into possession and placed it into the bag shown to him on direct examination. Deputy Lohnes testified that he took possession of the ashtray at "zero four zero eight (0408) hours on the early morning hour of the 6th" and retained possession until he submitted it into evidence at his office. The evidence was secured in an evidence locker, to which the deputy and an evidence custodian had a key. According to Deputy Lohnes, the ashtray was in the possession of the Calcasieu Parish Sheriff's Office until he retrieved it. When asked how the ashtray arrived at trial, Deputy *1018 Lohnes stated that he would need an evidence receipt from the evidence department. When asked if he gave custody of the ashtray to someone else before that day, Deputy Lohnes stated that he did. Defense counsel objected to the introduction of the ashtray because a complete chain of custody had not been shown and made that objection continuing as to the items being offered by the State.
Our review reveals no error in the admission of State's Exhibit 26. By testifying that it was the same evidence he seized from the crime scene, as well as testifying that it was the same ashtray depicted in State's Exhibit 5B, Deputy Lohnes positively identified the ashtray and six spent shell casings in Exhibit 26 as the same ashtray and shell casings seized from the Guidry residence on the night of the murders. This type of identification is in accord with the method described by the supreme court in Cosey.
The next item of evidence the Defendant claims was improperly admitted was State's Exhibit 27, a telephone. Deputy Lohnes identified Exhibit 27 as the same telephone he recovered from "the female victim's right hand at zero four one three (0413) hours." Later, he was asked if the telephone appeared to be the same telephone that he collected on the night of the murders, and Deputy Lohnes responded, "Yes, sir, it does." Deputy Lohnes examined a scene photograph and testified that the telephone depicted in the photograph was the same telephone marked for identification as State's Exhibit 27. Considering the visual identification above, we find no error in the admission of State's Exhibit 27.
The third item identified by Deputy Lohnes was one lead projectile marked for identification as State's Exhibit 28. Deputy Lohnes testified that the markings on the envelope indicated the projectile was recovered from the "entertainment center at zero four thirty-eight (0438) hours." When asked if it appeared to be the same item he recovered on the night in question, Deputy Lohnes stated, "Yes, sir, it does." Deputy Lohnes also examined State's Exhibit 5F and identified the object in the photograph as the entertainment center located in the living room. Deputy Lohnes identified the location on the entertainment center from which the projectile was recovered. According to Deputy Lohnes, he placed the projectile in a bag and numbered the bag as 00E-0469-JL, Item No. 9.
When the State moved to introduce Exhibit 28 into evidence, defense counsel again objected, arguing that the projectile was not a distinctive item that a person could identify. The trial court overruled the objection, finding that Deputy Lohnes testified that the projectile was removed from the entertainment center, and that the projectile had a unique, malformed shape as a result of striking the entertainment center.
Another lead projectile, State's Exhibit 29, was introduced during the testimony of Deputy Vezinot. Deputy Vezinot identified his handwriting on the bag containing Exhibit 29 and identified the evidence number that he had written on the bag. Deputy Vezinot removed a lead projectile from the bag and stated that the "envelope" within which the projectile was contained indicated the projectile was recovered at the rear passenger tire of a white Ford. When asked if he recalled recovering the projectile from that location, Deputy Vezinot stated, "Is it in the photo? No. I mean, II don't recall it, but I do have it notated in my notes." The following colloquy then took place:
Q Okay. And I don't know, Officer, if you can see it on State Exhibit S-4, *1019 but would you review State Exhibit S-4 and see if you are able to identify any picture where that item would have been recovered.
THE COURT: You can use that hand-held microphone if you need to.
THE WITNESS: Oh, okay.
A Rear tire of white Ford truck.
I don't show a picture of it.
MR. MICHAEL CASSIDY: (CONTINUING)
Q Okay. In that case, let me show you State Exhibit S-3 which indicates the vehicles on that board, and ask if you would be able tothere's a pointer there (indicating). Would you be able to use the pointer and indicate the location of where that lead projectile would have been found?
A It was at the rear tire of the white Ford Taurus, which I believe is this vehicle here (indicating). So it was probably somewhere in this area (indicating). Normally, when I recover an item, I do take a photograph of it. I don't know if you have my photographs here, but
Q Okay. Andnotnot that I'm aware of, Deputy.
Okay. Butbut can you identify on that board, again, wherewhere it was?
A This should by [sic] the white Ford Taurus (indicating), so it's probably in this area here (indicating) near the rear tire. So I would think it would be over here in this area (indicating).
Q Now, I'm curious. II understand that's what the evidence receiptor evidence list says. Can you read again what it says on that bag.
A Lead projectile fragment recovered at passenger rear tire of white Ford Taurus.
Q Okay.
A Being thethe vehicle was facing that way (indicating), it would be the passenger side.
Q And does that appear to be the same fragment that you recovered that particular night?
A Yes, it does.
When the State moved to file State's Exhibit 29 into evidence, defense counsel objected. The trial court overruled his objection, finding, "I think this witness has identified this as the projectile that he recovered from this specific ... location. So I think that a sufficient foundation has been laid for its introduction." We find no error in this determination.
The fourth item, State's Exhibit 30, was identified by Deputy Lohnes as a bag containing forty-four live 32-20 Winchester rounds. Deputy Lohnes testified that he recovered these rounds from the "appliance table in the kitchen at zero four zero five (0405) hours." When asked if the box of bullets contained in State's Exhibit 30 was the same box of bullets he recovered from the residence on the night in question, Deputy Lohnes stated, "Yes, sir, it is." Deputy Lohnes also examined State's Exhibits 5A and C, photographs taken at the Guidrys' home on the night in question, and identified the box of bullets in the picture. Considering Deputy Lohnes' testimony, we find no error in the determination that State's Exhibit 30 was sufficiently identified as the box of bullets recovered from the Guidrys' residence on the night in question.
State's Exhibit 31, another lead projectile, was identified by Deputy Vezinot. Deputy Vezinot identified his handwriting on the bag as well as the evidence number listed on the bag. When asked if the bag indicated where the lead projectile was recovered, Deputy Vezinot stated, *1020 "Yes. It was recovered on driveway behind white Ford truck." When asked if the fragment appeared to be in the same condition as when he recovered it, Deputy Vezinot replied, "Yes, it does." Considering this identification testimony, we find no error in the determination that State's Exhibit 31 was sufficiently identified.
Deputy Vezinot also identified State's Exhibit 32, one 32-20 caliber round. The evidence bag holding State's Exhibit 32 contained Deputy Vezinot's handwriting and an evidence number. According to Deputy Vezinot, the round was recovered from "the floor behind the carport door inside of the house." Deputy Vezinot also located Exhibit 32 in a photograph taken at the crime scene. The item depicted in the photograph was also identified by Sergeant Richard as an unspent round located on the floor behind the carport door. Again the determination that State's Exhibit 32 was sufficiently identified was not in error.
The final exhibit challenged by the defendant is State's Exhibit 33, a pair of metal frame glasses. Deputy Vezinot identified his handwriting on the evidence bag containing the glasses, as well as the evidence number on the bag. The evidence bag indicated that the glasses were recovered from the northwest corner of the backyard. When asked if he recalled recovering the glasses, Deputy Vezinot stated that he did and that State's Exhibit 33 appeared to be the same glasses recovered on the night in question. Deputy Vezinot examined State's Exhibit 19B and located the glasses in the photograph. A previous witness testified that although they were hard to see, the photograph showed a pair of glasses that was found in a pile of leaves. Finally, Deputy Vezinot testified that the glasses appeared to be in the same condition as when he found them. This testimony supports the determination that the glasses were sufficiently identified by Deputy Vezinot.
For the foregoing reasons, this assignment lacks merit.
Autopsy Report
The defendant claims that attachments to the autopsy report were entered into evidence despite the fact that the documents were hearsay and despite the fact that the State failed to timely disclose the evidence to the defense. On appeal, counsel claims the evidence should have been excluded "due to its hearsay character and also because the defense did not have the opportunity to review and investigate its contents to determine what to do with it."
This issue arose during the testimony of Zeb Johnson, an investigator for the Calcasieu Parish Coroner's Office. He explained that the coroner's office collected a number of articles from the bodies of the victims in the present case. Mr. Johnson testified as to each item submitted to the Calcasieu Parish Sheriff's Office and confirmed that the documents listing the articles were accurate copies of the originals. State's Exhibit 23 was identified as the evidence list for Burt LeBlanc; State's Exhibit 24 was identified as the evidence list for Kenny Guidry; and State's Exhibit 25 was identified as the evidence list for Christine Guidry. When the State moved to introduce the exhibits, defense counsel objected, claiming both that the best evidence of the above exhibits was the original[7] and that the defense was not provided *1021 a copy of the list in discovery. The State responded that all of the items contained in the above exhibits were listed on the evidence list.
Our review of the extensive discussion between the attorneys and the trial court regarding the admission of the exhibits reveals that no objection was made regarding whether the documents constituted hearsay. Rather, the discussion primarily focused on whether the defense was prejudiced by the State's failure to produce the lists during discovery. As explained above, La.Code Evid. art. 401 requires a contemporaneous objection at the trial level for review on appeal. In the absence of such an objection, the matter is not preserved for appeal. Therefore, we turn to the issue of whether the lists were improperly admitted due to the defendant's lack of access during discovery.
The Louisiana Supreme Court has explained that "not every violation of discovery procedures requires reversal; before defendant can complain of such a violation, he must show prejudice." State v. Sanders, 93-0001, p. 9 (La.11/30/94); 648 So.2d 1272, 1281, cert. denied, 517 U.S. 1246, 116 S.Ct. 2504, 135 L.Ed.2d 194 (1996). Here, the transcript demonstrates that the defense was unable to show prejudice due to the State's failure to attach the property lists to the autopsy reports provided during discovery. As explained by the State, the items included on the property lists of the deceased were contained in the evidence list from the sheriff's office which was provided to the defendant. During arguments, the defense was unable to articulate what the claimed prejudice would be, stating at one point that their "investigator may have been able to have done something with this, maybe some other experts that we would have been lead to because of this." Defense counsel further stated that: "It simply was not provided to us, andandit does prejudiceI can't tell you exactly how, because I don't have the expertise to determine what should have been done exactly." The trial court observed that several items on the list such as blood vials and fingernail clippings were not even being entered into evidence by the State and ultimately concluded that no prejudice was demonstrated. The trial court explained:
Well, due to the fact that II believe that there's not any prejudice and due to the fact that thesethese other items of evidence or [sic] not going to be introduced except for the bullets and I find I don't think the fact that the State hashas not complied with discoveryI think it was inadvertent. It wasn't intentional, and there was no bad faith on their part.
Again on appeal, the defense has not shown in what way it was prejudiced by the State's failure to produce the lists. This is true particularly in light of the type of items apparently at issue and the defendant's early admission that he was, in fact, responsible for the shooting deaths of the three victims. We find no error in the trial court's determination that the defendant failed to demonstrate prejudice.[8]
Police Report
The defendant claims the trial court erred in admitting a hearsay police report over objection, where the witness could not recall the details of the report and where *1022 attempts to refresh his recollection were unsuccessful. Questioning Deputy Monty Chevallier on re-direct, the State asked if the deputy recalled making a written statement in this particular case, referring to State's Exhibit 50, an investigative report prepared by Deputy Chevallier, in which the deputy sets forth a statement made to him by the defendant. When Deputy Chevallier stated that he did remember making a statement/report, the State asked if he could repeat the statement that the defendant made to him about other people. Defense counsel objected, arguing that the question was beyond cross-examination. After a brief discussion, defense counsel simply asked the State to rephrase the question. The State then asked, "Deputy Chevallier, do you recall writing on your statement that the defendant had asked you if any of the guys were hurt bad, and if so, he hoped they were on duty?" Deputy Chevallier responded, "Yes, sir." Defense counsel objected and asserted that the question went beyond direct examination and cross examination. In response to the objection, the trial court stated, "He responded to your question a little bit different than what hiswhat his answer was on direct, and I think he has to clarify that."
The trial court then stated, "Now, I thought your objection was going to be that he read the statement. I thought your objection was going to that Mr. Cassidy read the statement ... and that would have been a valid objection." Defense counsel responded, "Well, then, Your Honor, that's an objection, too." Defense counsel argued that "the witness is spoiled and cannot answer this question because he refreshed his memory rather than letting the witness do it." The trial court agreed that the procedure was improper, but stated, "the cat's out of the bag." The trial court also stated that informing the jury of error would only emphasize the problem. Defense counsel asked the trial court to instruct the State to discontinue this line of questioning, The trial court stated that it would not instruct the State to discontinue the questioning, but would instruct it to let the witness review the statement to refresh his memory. Finally, the trial court stated, "The objection insofar as this line of questioning being outside the scope is overruled.... The objection insofar as the improper method to refresh the witness' memory is sustained."
The State once again proceeded with the same line of questioning and asked Deputy Chevallier to review page two of his report. When the deputy finished reviewing the report, the State asked if the defendant made any statements to him concerning hurting other people. Deputy Chevallier stated that the defendant asked him if anyone was hurt, and "if so, he hoped they was on duty." The State followed, "And I want to make sure, Deputy Chevallier, `cause Ithat's what I recall you saying to me during direct examination, but when Mr." Defense counsel immediately objected, arguing that the State was coaching the witness. The trial court agreed and instructed the State not to lead the witness. Resuming the questioning, the State asked Deputy Chevallier if seeing his report would help him remember the exact language of the statement. When Deputy Chevallier stated that it would, the State asked him to tell "us" the exact language contained in the report concerning the defendant's statement. Defense counsel objected and the following colloquy ensued:
MR. DEMORUELLE [For the Defense]: He already let the witness see the report, and now he's giving it back to him.
How many times is he going to be refreshed? *1023 MR. MICHAEL CASSIDY [For the State]: II think I'm allowed toto do that, Your Honor. A witness is allowed to read from his statement ifif the statement accurately reflects what was said in his opinion.
THE COURT: Well, hehe can refresh his memory.
Has he not done so?
MR. DEMORUELLE: Yeah, `cause he's readhe's read the report, Judge.
MR. MICHAEL CASSIDY: But hehe still didn't say it
MR. DEMORUELLE: But, Your Honor,
MR. MICHAEL CASSIDY: He's saying it's exactly the same as his report.
MR. DEMORUELLE:his memory was refreshed, and the reportthat's that's why you let him read the thing, and now he wants him to say the exact words. This is not refreshing. This is reading from the report.
THE COURT: So what's your objection?
MR. DEMORUELLE: My objection is that it's improper.
THE COURT: Well, II agree. I think he'she's already been allowed to refresh, and if he doesn't say what he'sif he didn't get his memory refreshed the first time, then it'syou got to move on to something else.
MR. MICHAEL CASSIDY: Well, I think I can still ask him if his report says something different which would be more accurate and then still get him to read from the report.
MR. DEMORUELLE: No, sir.
MR. MICHAEL CASSIDY: How is that improper?
MR. DEMORUELLE: Because it's improper to let him read from his report. His memory has been refreshed and now he's got to testify from memory.
THE COURT: Well, nownow, ifif heif his memory is not refreshed by reading the report, then the report can be introducedthen the report can come in.
Now, the report may contradict his testimony in court and that's an area that you could cross him on and
MR. DEMORUELLE: Uh-huh (yes).
THE COURT:and I would allow you to.
But I think that's theyou know, if if by refreshing his memory, it'sit's not effective and he still testifies contrary to what his report says, then the report can come in and be used to cross him on.
MR. DEMORUELLE: Judge, let's note for the record that his report that he's been shown is highlighted in all kinds of colors and everything, and he
THE COURT: I understand.
MR. DEMORUELLE:just can't remember.
THE COURT: I understand. I understand.
Well, ififat this pointMr. Cassidy, at this point, you've asked him the question. His memory may not have been fully refreshed. So you need to either get the report in oror move on to another line of questioning.
MR. DEMORUELLE: Please, sir, let uslet us remind Mr. Cassidy not to lead him in to answers.
THE COURT: Okay.
(DISCUSSION HELD AT THE BENCH CONCLUDED.)
MR. MICHAEL CASSIDY: One (1) second, Your Honor.

*1024 MR. MICHAEL CASSIDY: (CONTINUING)
Q Deputy Chevallier, would your memory be more accurate today or on February 15th of 2000 when this report was written?
A More accurate on Februaryon February 15th.
Q And specifically as to the exact words that the defendant may have told you, would your memory be more accurate today or on February 15th of 2000?
A February 15th of 2000.
Q So as to the words that the defendant told you that you wrote done [sic] in your report, the report would be more accurate as of February 15th of 2000 then [sic] your testimony today?
A Yes, sir.
MR. MICHAEL CASSIDY: I'd like to mark this as State Exhibit S-50.
MR. MICHAEL CASSIDY: (CONTINUING)
Q I want to show you an exhibit that has been marked for identification as S-50, and ask you if that is a copy of your complete report in this particular cases [sic].
A (Witness examines S-50.)
Yes, sir, that's mine.
Q Two (2) pages; is
A Yes, sir.
Qthat correct?
A Yes, sir.
Q And is that a copy of your signature at the bottom of each page?
A Yes, sir, it is.
MR. MICHAEL CASSIDY: At this time, Your Honor, the State would move to file into evidence State Exhibit S-50.
MR. DEMORUELLE: May it please the Court, we make the same objection we made at the bench awhile ago.
THE COURT: All right. Objection is noted. State 50 will be received.
(WHEREUPON S-50 WAS FILED INTO EVIDENCE.)
MR. MICHAEL CASSIDY: I have no further questions-well, hold on.
May I approach the witness, Your Honor?
THE COURT: Yes, sir.
MR. MICHAEL CASSIDY: (CONTINUING)
Q On State Exhibit S-50, I would like you to read, Deputy Chevallier, that top paragraph, please.
A Phillip asked me if any other guys were hurt bad, and if so, he hoped they were on duty.
MR. MICHAEL CASSIDY: I have no further questions, Your Honor.
Later, while the jury was out of the courtroom, defense counsel urged a mistrial. Defense counsel stated, "I think the conduct of the prosecutor when he read out to the officer his written report I think it was prejudicial to the jury and it refreshed his memory before he had the report and I think thatthat is prejudicial to the defendant." The trial court denied the motion.
In its brief, defense counsel argues that the police report is inadmissible hearsay, stating:
Particularly in this case, where the State could not get the information from the report into the record through its witness, the introduction of the report was improper. Once the State could not refresh the witness, it simply could not establish the facts in the report. There is no exception carved out of the hearsay rule for those circumstances where *1025 the State simply needs the evidence in the record.[9]
In addressing this claim, we first note that the defendant's assertion is factually incorrect. The defendant claims the State was not able to elicit from Deputy Chevallier testimony which was consistent with his report despite the fact that the deputy was allowed to review the report to refresh his memory. In its second attempt to question Deputy Chevallier regarding his statement, the State asked Deputy Chevallier if he recalled writing in his statement that the defendant had asked if anyone was hurt, and if so, he hoped they were on duty. Deputy Chevallier responded, "Yes, sir," indicating that he did remember writing that in his statement. Later, in its third attempt to question Deputy Chevallier regarding the prior statement, the State asked the deputy to review page two of his report. When the deputy finished reviewing the report, the State asked if the defendant made any statements to him concerning hurting other people. Deputy Chevallier stated that the defendant asked him if anyone was hurt, and "if so, he hoped they was on duty." We conclude these collogues indicate that Deputy Chevallier's memory was refreshed when he was shown his statement. During the State's third attempt to question him about the statement, the deputy was also able to testify fully and accurately regarding the statement made to him by the defendant. The defendant does not allege on appeal that the trial court erred in allowing the State several opportunities to question Deputy Chevallier regarding the statement, even after the State erroneously read the statement from the police report. The defendant argues only that the report itself should not have been admitted.
With regard to the admission of this type of report, La.Code Evid. art. 803 provides in pertinent part:
The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
....
(5) Recorded recollection. A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable him to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in his memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence and received as an exhibit but may not itself be taken into the jury room. This exception is subject to the provisions of Article 612.
....
(8) Public records and reports. (a) Records, reports, statements, or data compilations, in any form, of a public office or agency setting forth:
....
(b) Except as specifically provided otherwise by legislation, the following are excluded from this exception to the hearsay rule:
(i) Investigative reports by police and other law enforcement personnel.
La.Code Evid. art. 612 provides in pertinent part:

*1026 B. Criminal cases. In a criminal case, any writing, recording, or object may be used by a witness to refresh his memory while testifying. If a witness asserts that his memory is refreshed he must then testify from memory independent of the writing, recording, or object. If while testifying a witness uses a writing, recording, or object to refresh his memory an adverse party is entitled, subject to Paragraph C, to inspect it, to examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness.
Even in the event the report was erroneously admitted into evidence, any error was harmless under these circumstances. In State v. Berkeley, 00-1900 (La.App. 5 Cir. 5/30/01); 788 So.2d 647, the defendant argued that the trial court erroneously allowed the State to impeach the defendant by having the defendant read a sentence from a police report. The defendant read to the jury a portion of the police report wherein the officer had written that someone told him the defendant was drinking beer. The fifth circuit recognized that investigative police reports are inadmissable hearsay under La.Code Evid. art. 803(8)(b)(i), but the court found the error was subject to the harmless error analysis. The court found the brief reference to the statement was cumulative and did not contribute to the verdict. The court noted that two officers testified at trial regarding the smell of alcohol on the defendant and that the defendant admitted he had been drinking that day.
Any error in this case was also harmless. As stated, Deputy Chevallier's "refreshed memory" testimony regarding the defendant's statement was no different than the version of the defendant's statement set forth in the report. The defendant does not claim that any other portion of the police report was prejudicial. Considering the above and considering the evidence produced at trial concerning the defendant's intent to shoot Officer LeBlanc, any error related to the introduction of the report was harmless. Accordingly, this assignment lacks merit.

DECREE
For the foregoing reasons, the convictions of the defendant, Phillip Lynn Karam, are affirmed. The defendant's sentences are vacated and the matter is remanded for resentencing in accord with this opinion.
CONVICTIONS AFFIRMED. SENTENCES VACATED. REMANDED.
NOTES
[1] Due to concern over publicity associated with the case, the trial court granted the defendant's motion for change of venue. Although the jury was selected from St. John the Baptist Parish, the trial was held in Jefferson Davis Parish.
[2] Officer Murry testified similarly, stating that the defendant's response to Officer LeBlanc's inquiry was: "[T]hey're both dead or something to that fact."
[3] Although the defendant does not question the specific intent element with regard to the death of Burt LeBlanc, we note that defense counsel questioned this element at trial. In closing argument, defense counsel suggested that the defendant thought that Officer LeBlanc was wearing a bulletproof vest, so he shot him in the chest. Defense counsel proposed that if the defendant intended to kill Officer LeBlanc, he would have shot him in the head. This hypothesis too was apparently rejected by the jury and has been abandoned on appeal.
[4] Art. 841. Bill of exceptions unnecessary; objections required

A. An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. A bill of exceptions to rulings or orders is unnecessary. It is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take, or of his objections to the action of the court, and the grounds therefor.
B. The requirement of any objection shall not apply to the court's ruling on any written motion.
C. The necessity for and specificity of evidentiary objections are governed by the Louisiana Code of Evidence.
[5] The hearing on the motion to quash the venire was held on Monday, July 16, 2001.
[6] Further, although the defendant does not make a point of the State's reference to the failure to produce facts mentioned during the defendant's opening statement, we point out the Louisiana Supreme Court has found no abuse of discretion in a denial of a mistrial where the prosecutor commented that the defendant did not produce character evidence referenced in opening statements. See State v. Williams, 355 So.2d 1291 (La.1978).
[7] The trial court rejected the defendant's objection regarding whether the property lists were copies or original documents, stating: "Insofar as the fact that it's a copy and not the original, the witness has testified that, you know, it is ais a true depiction of the original, which would reflect,accurately reflects what the original contains, so that objection is overruled." This objection has not been raised by the defendant on appeal.
[8] Additionally, any error in the admission of the evidence lists themselves would be harmless in light of the fact that Mr. Johnson testified, without objection, to the information contained on the lists.
[9] The State contends that this argument was not preserved by objection at trial. When the actual report was introduced into evidence by the State, defense counsel objected, stating that his objection was the same as that previously argued at the bench. Defense counsel essentially objected to the procedure used by the State in questioning Deputy Chevallier and attempting to allow him to refresh his memory. Although defense counsel did not specifically state that the report should not be admitted because it was hearsay, the substance of his arguments was sufficient to preserve this issue for appeal.