# STATE OF LOUISIANA

# COURT OF APPEAL, THIRD CIRCUIT

## 05-1470

**STATE OF LOUISIANA**

**VERSUS**

**WILBERT RIDEAU**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, DOCKET NO. 15321-01
HONORABLE DAVID A. RITCHIE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**SYLVIA R. COOKS**
**JUDGE**
\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks and James T. Genovese, Judges.

Genovese, J., concurs.

**ORDER VACATED**

F. Wayne Frey
Carla S. Sigler
Assistant District Attorney
Fourteenth Judicial District
P.O. Box 3206
Lake Charles, Louisiana 70602-3026
(337) 437-3400
COUNSEL FOR APPELLEE:
    State of Louisiana

George Kendall
Holland & Knight
195 Broadway, 24th Floor
New York, New York 10007
(212) 513-3358
COUNSEL FOR APPELLANT:
    Wilbert Rideau

**COOKS, Judge.**

## STATEMENT OF THE CASE

On January 15, 2005, Wilbert Rideau was convicted of manslaughter. He waived the delays for sentencing. The trial court sentenced Rideau to serve the maximum term of twenty-one years at hard labor, with credit for time served.[1] Since he had already served forty-four years in Angola, he was released from custody and became a free man. As part of the sentence, the trial court ordered Rideau "to pay all court costs associated with these proceedings." Rideau was not informed of the amount of the costs at the time of sentencing. Sixty days later, on March 15, 2005, the trial court issued an Order casting Rideau with court costs and indigent defense fees in the amount of $127,905.45. Rideau filed a Motion to Vacate the Order compelling him to pay itemized court costs and to reimburse the Indigent Defender's Board (IDB) for all costs associated with his defense, including expert witness fees and expenses. The trial court denied the motion and Rideau filed this appeal. *Amicus curiae* briefs in support of vacating the Order have been filed in this case, along with supporting affidavits submitted by public defenders and defense counsel throughout the State.[2] We have pointed out and discussed at length numerous constitutional

---

[1] At the time of the commission of the offense the maximum term of imprisonment for a manslaughter conviction was twenty-one years. La.R.S. 14:31 has been amended and now provides a maximum term of imprisonment of forty years.

[2] *Amicus curiae* briefs were filed in support of vacating the Order of March 15, 2005 by defense attorneys Michael Fawer, John Digiulio, Thomas Guilbeau, Phyllis Mann, J. Michael Small, Henry Walker, & Laurie White and by the Louisiana Public Defenders Association & the Louisiana Association of Criminal Defense Lawyers. The record also contains affidavits in support of vacating the Order from the following: David E. Marcantel, Chief Public Defender, 31st Judicial District; M.Craig Colwart, Chief Public Defender,16th Judicial District; Michael A. Courteau, managing attorney, 4th Judicial District Indigent Defender Board; Richard M. Tompson, Chief Indigent Defender, 24th Judicial District; Alan J. Golden, Chief Counsel, Caddo Parish Public Defender's Office; Richard B. Stricks, public defender, St. John the Baptist Parish; Thomas Lorenzi, criminal defense attorney, 14th JDC; Walter M. Sanchez, criminal defense attorney,14th JDC; and, Charles C. St. Dizier, criminal defense attorney, 14th JDC, five years with Calcasieu Parish Public Defender's Office.

issues raised in this unique case to alert the lower courts of the constitutional pitfalls which may arise in enforcing the costs mandate found in La.Code Crim. P. Article 887(A). In this case, we find the trial court lacked legal authority to act for the parish of Calcasieu and lacked standing *in its own right* to seek recoupment of funds expended from the Criminal Court Fund. The trial court, however, retains authority to enforce the January 15, 2005 sentence which ordered Rideau to pay costs and to assess reasonable costs upon presentment by the parties who actually "incurred" the Article 887(A) expenses, consistent with this opinion and the Constitutions of Louisiana and the United States. We also vacate that portion of the March 15, 2005 Order directing Rideau to reimburse the IDB for all costs, expert witness fees and expenses associated with his defense. Louisiana Revised Statutes 15:148 does not authorize the trial court to assess these costs against a defendant who was "*initially indigent*" but who may have the potential in the future to pay such costs.

## LEGAL HISTORY OF THE CASE

In 1961, Wilbert Rideau robbed a bank in Lake Charles, Louisiana kidnaped three bank employees, and murdered one of the tellers, Julia Ferguson. Rideau was black, nineteen years old and indigent. The crime was sensational news in Lake Charles. Passions ran high and televised details of the crime, including an "interview" with Rideau was broadcast throughout the area. Because of the highly charged atmosphere in Lake Charles, the defense moved for a change of venue, which was denied by the trial court. Justice was administered swiftly, although not constitutionally, for Rideau. He was convicted of first degree murder and sentenced to death. The conviction was reversed by the United States Supreme Court. *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417 (1963). In a stinging indictment of the criminal justice system in Calcasieu Parish, the Court called the proceedings a

3

"kangaroo court" and described the events leading up to and during the trial as a "spectacle." *Id.* at 725-26.

Significantly, the Court noted the handling of Rideau's case was unprecedented in Calcasieu Parish and this Defendant was being singled out for special treatment by the criminal justice system. *Id.* at 727. This observation, made by the Court in 1963, holds true even today.

Venue for the second trial was moved to Baton Rouge, Louisiana . Rideau was tried, convicted and sentenced to death. He petitioned for habeas corpus relief in federal court alleging violations under *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770 (1968).[3] The State conceded that a reversal was required in Rideau's case and his second conviction was vacated.

Rideau was tried a third time in Baton Rouge. He was convicted again and sentenced to death. In light of the United States Supreme Court decision in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726 (1972), the Louisiana Supreme Court annulled Rideau's death sentence and ordered that he be sentenced to life imprisonment. *State v. Rideau*, 278 So.2d 100 (La. 1973).

Rideau filed a petition for habeas corpus relief in federal court alleging his indictment and conviction were unlawfully obtained because black jurors were systematically excluded from the grand jury in Calcasieu Parish. The United States Fifth Circuit Court of Appeals, Judge Dennis[4] writing, agreed, and reversed Rideau's third conviction. The federal appellate court found Calcasieu Parish officials used race-coded cards to exclude black individuals from the grand jury–a practice, the court noted, that had been prohibited by law "[f]or well over a century." *Rideau v.*

---

[3] *Witherspoon* held the death penalty invalid when individuals objecting to the death penalty were excluded from the jury.

[4] A former justice of the Louisiana Supreme Court.

4

*Whitley,* 237 F.3d 472, 484 (5th Cir. 2000), *cert. denied, Cain v. Rideau,* 533 U.S. 924, 121 S.Ct. 2539 (2001).

While the federal appellate court reversed the conviction it left open the option for the State to retry Rideau "in accordance with the Constitution, the laws, and this opinion." *Id.* at 489. In January 2005, Rideau was tried a fourth time and convicted of manslaughter.

Although his convictions were reversed numerous times, Rideau did not escape punishment for the murder of Julia Ferguson, nor should he have. Rideau is sixty-four years old and has spent forty-four years in the Angola State Penitentiary, some of which was served either in isolation or on death row. Each reversal brought a new wave of publicity and has kept the details of the crime and the name attached to it - that of Wilbert Rideau - fresh in the minds of the people of Lake Charles for much of that time.

There is another reason Wilbert Rideau has remained in the news for forty-four years. During his incarceration, Rideau has rehabilitated himself and has become widely known as an award winning journalist and film maker.[5] He has appeared twice as a featured speaker before the American Society of Newspaper Editors in Washington, D.C. For more than twenty years, with the approval of the Louisiana Department of Corrections, Rideau has traveled the State, with only an unarmed escort, speaking to at-risk teenagers about the dangers of a life of crime and the

---

[5] These awards include the George Polk Award, the Robert F. Kennedy Journalism Award, the Sidney Hillman Award, and the American Bar Association's Silver Gavel. As editor, Rideau transformed the prison newspaper, *The Angolite*, into a seven-time finalist for the National Magazine Award. He co-authored and co-edited two books used as texts in college classrooms: *The Wall is Strong: Corrections in Louisiana* and *Life Sentences: Rage and Survival Behind Bars*. Rideau co-directed the documentary film, *The Farm*, which received an Academy Award nomination. He directed and narrated a short documentary film on the effect of an aging inmate population, which film won the CINE Golden Eagle Award. He provided the story and guidance for the documentary film, the *Execution of Antonio James*, which won the CINE Golden Eagle Award, the Thurgood Marshall Award, and the Louisiana Bar Association's first place Gavel Award for overall excellence in the media. Rideau has been called the most rehabilitated prisoner in America.

horses of prison life.

In examining the legal history of this case, two facts emerge: first, the federal decisions reversing Rideau's convictions were not based on novel theories of law, but rather were founded on well-established principles of constitutional due process, which safeguards were not being implemented in the criminal justice system in Louisiana; and, second, for whatever reason, Rideau's case has been handled differently from other criminal cases in the Louisiana justice system.[6] The present appeal illustrates these facts.

## THE PRESENT APPEAL

In 2001, the Calcasieu Parish District Attorney, Rick Bryant, made the decision to retry Rideau in Lake Charles on one count of murder. Rideau offered to plead guilty to manslaughter. The State rejected the plea agreement and proceeded to trial.[7]

---

[6] It has been suggested the publicity surrounding the reversal of each conviction may explain the disparity in the treatment of the Rideau case by the Department of Corrections. The defense points out in brief that, in 1961, in Louisiana, a prisoner fully served a life sentence by serving ten years and six months in prison, and by maintaining good behavior during that time. Hundreds of lifers were released pursuant to this policy after serving ten years and six months, or some minimal additional time. This practice was so firmly entrenched as policy that a life sentence was universally spoken of as a "10/6" sentence. In *State v. Shaeffer*, 257 So.2d 121, 134 (La. 1971), Justice Sanders, dissenting from a majority opinion commuting three death sentences to life imprisonment, observed: "[A] death sentence is converted into one that really means imprisonment for only ten years and six months. No true life sentence exists in Louisiana law." *See also State v. Dunn*, 408 So.2d 1319 (La. 1982) and *Garrett v. Maggio*, 685 F.2d 158 (5th Cir. 1982). In 1984, 1986, 1988, and 1990 Rideau applied to the Board of Pardons for release based on the "10/6" rule. The pardon boards repeatedly recommended his release, but he was denied release each time by the Governor.

[7] The defense contends newspaper accounts of the Rideau case indicate it was clear to the District Attorney he would have difficulty obtaining a favorable verdict in a forty year old case where the defendant had already served decades in prison. *See* Eric Cormier and Jeremy Harper, *Rideau Backers Elated, Victims Families Saddened by Jury Vote*, Lake Charles American Press, January 16, 2005, at A5: "I'm extremely disappointed – and probably not surprised considering that you had 13 witnesses who had died since the last trials and they couldn't contradict a lot of what was being brought out by the defense," Bryant said . . . "The jury knew that the defendant had been in jail for some 43 years, and I think that had an impact," Bryant said. Mike Jones, *D.A.: High Court Appeal in Rideau Case Pending,* Lake Charles American Press, February 1, 2001, at B6: "Bryant said it would be hard to retry the case since the gun and knife used in the murder are missing and many of the witnesses are dead." Adam Liptak, *Freed after 44 Years, A Prison Journalist Looks Back and Ahead,* N.Y. Times, Jan. 17, 2005, at A11: It's very difficult to try a case that's 44 years old." [Bryant] said. "We had 13 witnesses who were unavailable, including the two eye witnesses . . ." Manual Roig-Franzia, *Prison Journalist Loses New Trial Bid*, Times-Picayune, May 6, 1999, at A8: In a report of the evidentiary hearing in the federal habeas proceeding in which Mr. Rideau challenged the lawfulness of the 1970 conviction, the article reports that "Calcasieu Parish District

Because of pre-trial publicity in the Lake Charles area, the defense moved for a change of venue. In January 2005, an impartial jury panel was selected from Ouachita Parish. The District Attorney made the decision to have the Ouachita Parish jury transported to Lake Charles, where expenses were incurred for lodging and meals for the duration of the trial.[8] At the time of the fourth trial, Rideau was sixty-three years old, incarcerated, and still indigent.

On January 15, 2005, Rideau was convicted of manslaughter, the same crime he had agreed to plead guilty to earlier. The trial court sentenced him to serve the maximum term of twenty-one years at hard labor with the Department of Corrections, with credit for time served. Since Rideau had already served forty-four years in prison, he was released from custody. As part of the sentence, the trial court orally ordered Rideau "to pay all court costs associated with these proceedings."

On March 15, 2005, an Order was signed and filed with the Clerk of Court of Calcasieu Parish by Judge David A. Ritchie, the sentencing judge. The Order provided, in relevant part:

> **IT IS ORDERED** that in accordance with La.C.Cr.P. art. 887, the above defendant be cast with all court costs related to his trial which resulted in a conviction of manslaughter on January 15, 2005. A copy of the itemized costs are attached hereto as Exhibit A and are made a part of this order.
>
> **IT IS FURTHER ORDERED** that the defendant reimburse the

---

Attorney Rick Bryant argued that he could not mount an effective new trial because most of the key witnesses are dead."

[8] The defense stated in its brief that Rideau waived his right to have the jury sequestered in Ouachita Parish. While the prosecution agreed the jury could not come from Calcasieu Parish, the defense contends, it was the prosecution who opposed a complete change in venue. Instead of trying the case in Ouachita Parish, where a non-sequestered jury could go home each night, the prosecution made the decision to try the case in Lake Charles with a Ouachita Parish jury. While we do not question the control of the District Attorney in the prosecution of a case under La.Code Crim.P. art. 61, the prosecutor's decision necessitated transporting the jury to Lake Charles and, thereby, caused the governing authority to incur expenses to house, feed, and secure them for the duration of the trial, which costs were then assessed to Rideau. *See e.g.* Best Suites - $16,874.33, Calcasieu Parish Sheriff's Office - $12,432.77, Mayo Tours - $2,116.00.

7

Indigent Defender's Board for all costs associated with his defense, including expert witness fees and expenses.

The costs, itemized by the trial court and attached to the Order, totaled $60,905.45, most of which were costs associated with impaneling, housing, feeding, transporting and providing security for the jury.[9] Indigent Defense costs were estimated to be approximately $67,000.00, bringing the total court costs assessed to Rideau to $127,905.45. Rideau filed a Motion to Vacate the Order and a hearing was held. The trial court denied the defense motion. Rideau filed this appeal asserting several constitutional violations.

## LAW AND DISCUSSION

Rideau was assessed with the following: (1) court costs; and (2) indigent defense cost. We will discuss each assessment separately.

## COURT COSTS

### I.

### *Constitutional Principles and Louisiana's Scheme for Recoupment of Court Costs from Indigent Defendants*

*A. Due Process Requirements–notice, opportunity to be heard, and other considerations.*

The trial court relied on La.Code Crim.P. art. 887(A) as authority for the recoupment of court costs. This article provides, in relevant part:

> A defendant who is convicted of an offense or is the person owing a duty of support in a support proceeding shall be liable for all costs of the prosecution or proceeding, whether or not costs are assessed by the court, and such costs are recoverable by the party or parties who incurred the expense. However, such defendant or person shall not be

---

[9] The vendors listed in the Order are as follows: Office Depot, Ouachita Parish (advance deposit), Piccadilly, Pat's of Henderson, Holiday Inn (Monroe), Ruby Tuesday, Ms. Dee, Pappy's, Sam's, Johnny Carinos, Tony's, Pronia's, Harlequin, Steamboat Bill's, Pam Allee, Judge David Ritchie, Kay Miller, Heath Dorsey, Elizabeth Surles, Patricia Hanks, Chris Hinton, Wayne Day, Seafood Palace, Super Stop #26, Best Suites, McFillen, Denise Savant, Sir Speedy, Calcasieu Parish Sheriff's Office, Unishippers, Mayo Tours, Witness Fee-Gary Shannon, Witness Fee-Cat Oubre. As appendices to this decision, the trial court's itemized list is reproduced, as Exhibit A, as well as Defendant's submission classifying the expenses according to their purpose, as Exhibit B.

liable for costs if acquitted or if the prosecution or proceeding is dismissed. In addition, any judge of a district court, parish court, city court, traffic court, juvenile court, family court, or magistrate of a mayor's court within the state shall be authorized to suspend court costs.

This provision, together with other articles, establishes Louisiana's statutory scheme for the assessment of courts costs against a convicted defendant. Under La.Code Crim.P. art. 887(A), upon conviction, a defendant, by operation of law, is legally obligated to pay for *"all costs of the prosecution"* to the *"party or parties who incurred the expense."* It is within the discretion of the trial court to suspend the imposition of some or all of the costs. The liability for costs is part of the totality of the sentence imposed upon a defendant. The statute seems to suggest that notifying the defendant of the amount owed *at the sentencing stage* of the proceeding is essential for two reasons. First, La.Code Crim.P. art. 886 gives the defendant only sixty days to pay the amount owed. In the event of nonpayment, the trial court is authorized to sign a judgment for the amount assessed which is filed of record and can be enforced, as any other money judgment, in either the civil or criminal court. Louisiana Code of Criminal Procedure Article 886 provides, in relevant part:

> A. In the event of nonpayment of a fine, nonpayment of restitution to the victim, or nonpayment of a fine and costs, within sixty days after the sentence was imposed, *and if no appeal is pending*, the court which imposed the sentence may sign a judgment against the defendant in a sum equal to the fine or restitution plus judicial interest to begin sixty days after the sentence was imposed plus all costs of the criminal proceeding and subsequent proceedings necessary to enforce the judgment in either civil or criminal court, or both. Collection of the judgment may be enforced in either criminal or civil court, or both, in the same manner as a money judgment in a civil case.

Louisiana Code of Criminal Procedure Article 886.1 also provides "[i]f a civil judgment is signed in accordance with Article 886, the judgment shall be executory upon rendition by the court provided the defendant was notified at the time of sentencing of the possible rendition of a civil judgment in the event of his failure to

pay the fine and costs. In all other cases, the judgment shall be executory immediately upon service of the notice of judgment upon the defendant in accordance with Code of Civil Procedure Article 1913." Louisiana Code of Criminal Procedure Article 886 also provides the judgment may be collected "in the same manner as a money judgment in a civil case."

The second reason for informing the defendant of the costs at sentencing is to allow him time to file a motion to reconsider the sentence within thirty days, to contest the amount of the costs based on excessiveness of sentence or abuse of discretion and to timely preserve the issues for appeal. Louisiana Code of Criminal Procedure Article 888.1 provides, in part:

> A.(1) In felony cases, within thirty days following the imposition of sentence or within such longer period as the trial court may set at sentence, the state or the defendant may make or file a motion to reconsider sentence.
> . . . .
>
> E. Failure to make or file a motion to reconsider sentence or to include a specific ground upon which a motion to reconsider sentence may be based, including a claim of excessiveness, shall preclude the state or the defendant from raising an objection to the sentence or from urging any ground not raised in the motion on appeal or review.

In this case, the trial court did not inform Rideau, at sentencing, of the amount of the court costs he eventually was assessed to pay. Instead, the trial court rendered the order sixty days after sentencing casting Rideau with costs in the amount of $127,905.45. Because he was never informed beforehand, Rideau was unable to contest, either at sentencing or at a subsequent reconsideration hearing, the kind or amount of costs imposed, to attack imposition of the total amount as excessive and abusive or to establish that issuance of a judgment and enforcement would pose an undue hardship in the future on him. Moreover, at the present hearing to vacate the order, Rideau complains he was denied a fair opportunity to challenge the

*reasonableness* of the specific charges assessed against him.[10]

The trial court also declared that apart from what he deemed appropriate in a particular case, he was not bound by any constraints in casting Rideau with costs. The trial court stated:

> Well, let me say this, Mr. Kendall, First of all, you know, there's no policy or practice that — in other words, there are recommendations. There are things that, I guess, we normally do in certain situations. But to say there's a policy, I don't think that's an appropriate term or practice. Yeah, in certain types of cases. But I have to – I'm not bound by what any other Judge in this judicial district does, number one, or what any other Judge has done in the past. And I have to look at each case individually, okay, to see what's appropriate in that case.

The United States Supreme Court has been reluctant to approve sweeping recoupment statutes in states that do not afford defendants certain constitutional safeguards. Upholding Oregon's recoupment statute in *Fuller v. Oregon*, 417 U.S.

---

[10]  When Rideau's counsel attempted to attack  the charges as excessive and specifically noted some of the expenses were for the court's staff "to go to the best restaurant[s] in town," the judge was not pleased.  He voiced his discontent with counsel's attempt to broach the subject  by offering Rideau a worse alternative as a remedy and scolded counsel for referencing in brief language from *Yick Wo v. Hopkins*, 118 U.S. 356 (1886), a United State Supreme Court case :

**The Court**

"So would you like for me–instead of doing that, would you like for me to amend that order and get a– get a detailed cost of all the D.A.'s expenses and replace all those expenses, which are, you know, which would clearly be prosecutorial costs and substitute that for the security?

**Mr. Kendell**

Your Honor, we're here about the order that the Court issued on March 15.  That's what we're addressing.

**The Court**:

Well, I guess what I'm saying, I mean, you know, but you're complaining about that when, you know, I–I've–I think I've–I wasn't–as I've already said, you know, this wasn't–this wasn't something that I was trying to, you know, when you used that language in there about this hearkens back to the days when the recently freed slaves were, you know, placed with these large debt burdens, I mean, you know, that's insulting, you know, to suggest that–that that's what I was doing and all this discriminatory stuff in there.

****

Yeah, he had a lot of people willing to help him out for free like y'all–or at least at no cost to him rather.  Like you and your law firm, and the NAACP, and many others, and Mr. Murray, of course, of course, and that's great..."

40, 94 S.Ct. 2116 (1974), the Supreme Court specifically noted defendants were afforded an opportunity to contest the imposition of costs prior to assessment and the costs were specified by the statute. In *Fuller*, the defendant challenged the constitutionality of Oregon's recoupment statute, which required a convicted defendant to repay to the State the cost of providing him with effective representation of counsel, when he was indigent at the time of the proceeding, but subsequently acquired the means to repay the costs. The Supreme Court found the statute constitutional because it was narrowly drawn to specify which costs could be assessed against a defendant and provided other due process safeguards. The statute mandated that the trial court conduct a hearing to determine the ability of the defendant to pay "'taking into account the financial resources of the defendant and the nature of the burden that payment of costs will impose.'" *Id.* at 45. The imposition of a judgment could be rendered "only upon those with a foreseeable ability to meet it, and [enforced] . . . only against those who actually become able to meet it without hardship." *Id.* at 54. Further, the United States Supreme Court in *James v. Strange*, 407 U.S. 128, 142, 92 S.Ct. 2027 (1972), held "[s]tate recoupment laws, notwithstanding the state interests they may serve, need not blight in such discriminatory fashion the hopes of indigents for self-sufficiency and self-respect."[11] *See also Rinaldi v. Yeagar*, 384 U.S. 305, 86 S.Ct. 1497(1966).

The trial judge apparently relied on this court's opinion in *State v. Karam*, 02-

---

[11]In *James v. Strange*, 407 U.S. 128, 92 S.Ct. 2027 (1972), the Supreme Court found Kansas's recoupment statute violated the equal protection clause. In *James,* the defendant pled guilty to pocket picking. He received a suspended sentence and three years probation. The judicial administrator requested the defendant reimburse the State $500.00 within sixty days or a judgment would be rendered against him. The statute gave the judicial administrator discretion as to whether or not enforcement of the judgment would be sought. The Supreme Court found the Kansas statute unconstitutional because other than the homestead exemption, the statute provided that "(n)one of the exemptions provided for in the code of civil procedure shall apply to any such judgment" levied against the indigent defendant. *Id.* at 135. The Court stated: "For Kansas to deny protections such as these to the once criminally accused is to risk denying him the means needed to keep himself and his family afloat." *Id.* at 136.

0163 (La.App. 3 Cir. 7/31/02), 834 So.2d 1003, to support his position that Rideau was not entitled to attack the specific charges or to object to the reasonableness of the amounts prior to assessment against him. In *Karam*, the trial court ordered the convicted defendant to pay court costs in "the maximum amount allowed by law." The defendant appealed asserting the trial court erred in failing to assess a specific amount. This court held: "With regard to the defendant's contention that costs must be specified, La.Code Crim.P. art. 887 indicates that a defendant convicted of an offense is liable for costs of the prosecution, whether or not the costs are specifically assessed by the court." *Id.* at 1016.

The Defendant points out in Louisiana, in practice, *except in this case,* a defendant is notified at sentencing of the amount of the court costs assessed against him. In fact, as in Oregon, the costs are usually specified in statutes, ordinances, or schedules in each judicial district or municipality, are small in amount, and are often known by the defendant prior to sentencing.

Our supreme court has recognized, especially against indigent defendants, the constitution of this State and the United States, does place limits on the power of courts to assess fines and costs. Additionally, when enforcement of a statute, as written, violates constitutional principles, the courts have consistently declined to read the statute to reach an unconstitutional result. For example, La.Code Crim.P. art. 884 provides "[i]f a sentence imposed includes a fine or costs, the sentence shall provide that in default of payment thereof the defendant shall be imprisoned for a specified period not to exceed one year." Despite the clear mandate of this provision, the courts have consistently held an indigent person may not be incarcerated because he is unable to pay a fine or court costs. *Bearden v. Georgia*, 461 U.S. 660, 103 S.Ct. 2064 (1983); *State v. Zabaleta*, 96-2449 (La. 3/7/97), 689 So.2d 1369; *State v. Major*,

13

03-249 (La.App. 3 Cir. 3/2/05), 898 So.2d 548.

In this case, the amount Rideau has been assessed is extraordinary when compared to the amounts assessed in prior cases. Although he was granted fifteen days to "object" to the order fixing the amount, the trial judge appeared to give little consideration to his plea that the total amount was unprecedented, excessive, and too burdensome under the circumstances. Rideau argues that due process required the trial judge to do more than to compile the amount of court costs and to issue an order to enforce payment.[12] The trial judge decided to maintain the order directing Rideau to pay $127,905.45 as court costs despite his recognition that Rideau is indigent and does not currently have the ability to pay it.[13] If allowed to stand the order is enforceable *immediately* against any assets acquired or income earned by Rideau, as any other civil judgment, and without a subsequent hearing to determine whether enforcement would work an undue hardship upon him. Further, La.R.S. 20:1(C)(8) provides Louisiana's homestead exemption shall not apply to "any obligation arising from the conviction of a felony or misdemeanor which has the possibility of imprisonment of at least six months."

---

[12]Justice Douglas, concurring in the majority opinion, specifically noted in *Fuller* that in Oregon "[t]he costs which can be assessed are limited by statute to those 'specially incurred' by the State in prosecuting a defendant. Ore. Rev. Stat. §161.665(2). The Oregon Court of Appeals found that most costs on the prosecution side of the case could not be charged to a defendant, including police investigations, district attorneys' salaries, and sheriffs' salaries. 12 Or. App. 152, 157, 504 P. 2d 1393, 1396. Also, jury fees and the costs of summoning jurors, cannot be charged to the defendant. Ibid: see Ore. Rev. Stat §161.665(2). The costs which can be charged appear limited to those incurred for a defendant's benefit, such as defense counsel, defense investigators, and so on, which would be borne by a nonindigent defendant in a criminal trial. In addition, the Oregon statutory scheme places limits on the fees which an appointed counsel can receive, except in 'extraordinary circumstances,' thus limiting the eventual responsibility of a defendant under the recoupment statute. §135.055." *Fuller*, 417 U.S. 40, 55, fn.2 (Douglas, J., concurring.)

[13] The trial judge stated:
> I guess, the inference to what you just said was that maybe Mr. Rideau's not going to get very much from his book or get any kind of movie rights or anything like that, or money from that. And if that's the case then, you know what, I don't–I don't see that there's, you know, they'll never be able to go collect it from him ....So, if he ends up not having the ability to pay this then–then I don't think it's really going to be an issue.

14

*B. First Amendment Requirements–freedom of speech and recoupment statutes*

The only activity identified by the trial court which made Rideau an ideal candidate–in fact the only candidate–for imposition of these extraordinary costs is that he may potentially receive royalties from a "book or movie deal."

Whether a state's recoupment statute may target income derived from the exercise of a defendant's free speech was addressed by the United States Supreme Court in *Simon & Schuster, Inc. v. Members of the New York State Crime Victims Board*, 502 U.S. 105, 112 S.Ct. 501(1991). At issue was the constitutionality of New York's "Son of Sam" law which required publishers, contracting with defendants "accused or convicted" of crimes, to pay any royalties derived from any books published describing the crime or crimes committed by the defendants to the New York State Crime Victims Board. The money would be deposited in an escrow account, managed by the Board and made available to the victims of the crime and the criminal's other creditors. The reasons articulated by New York for enacting the law was to compensate crime victims and to prevent criminals from profiting from crimes. Initially, the Court reiterated a long-standing principle of constitutional law that statutes aimed at "content-based" speech violates the First Amendment by effectively driving certain ideas from the marketplace. However, the State argued it had a compelling interest in compensating victims and the statute was not aimed solely at speech describing the crime, as it "applie[d] to works on *any* subject, provided that they express the author's thoughts or recollections about his crime, however tangentially or incidentally." *Id*. at 121. In finding New York's law invalid, though it expressed compelling interests, the Supreme Court found "the State has little if any interest in limiting such compensation to the proceeds of the wrongdoer's speech about the crime." *Id.* at 120-21. Further, there was no explanation why "the

State should have any greater interest in compensating victims from the proceeds of such 'storytelling' than from any of the criminal's other assets[,]" and the State did not "offer any justification for a distinction between this expressive activity and any other activity in connection with its interest in transferring the fruits of crime from criminals to their victims." *Id.* at 120-21. Ultimately, the Court found the State could not establish it's compelling interest in compensating victims was furthered by placing a "financial burden" only on "speech-derived" income as opposed to other types of income. *Id.* at 105.

The Supreme Court also held in *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 107 S. Ct. 1722, (1987) even regulations aimed at proper governmental concerns can restrict unduly the exercise of rights protected by the First Amendment. To justify differential treatment in the exercise of this right, "the State must show that its regulation is necessary to serve a compelling state interest and is narrowly drawn to achieve that end." *Id*. at 231.

In deciding to order the payment of costs in this case, the trial judge specifically focused on Rideau's unique ability and potential to earn royalties from future publications or a movie deal. The trial court stated: "And so I assess–I assess costs which, you know as well as I do–if he never gets the money then there's not an issue there . . . . Probably, you know, this is another unique case... He's about to probably–I read a little article in the paper that he's expected to get a, I guess, a half million dollars. Whether that actually comes to fruition or not, you know, for a book deal, I don't know." The book deal evidence the trial court alluded to was gleaned from an article in the New York Post written by Keith J. Kelly entitled *Murder He Wrote*, which the trial court apparently read or heard about prior to the hearing. In the article, the author reports the "buzz" about Rideau possibly acquiring a book deal

16

for $500,000.[14]

It is true, the Louisiana statute at issue on its face does not target free speech activities as the only source for recouping costs from defendants. It is also true that Louisiana has a legitimate interest in assuring the availability of funds for the defense of indigents and maintaining the judicial system. But, enforcement of a state's recoupment statutes in a discriminatory manner that affects speech and singles out certain defendants nonetheless may threaten the First Amendment's right to free speech and the Fourteenth Amendment right to equal protection of the law. The United States Supreme Court has long held that the federal guarantee of due process and equal protection "extends to state action through its judicial as well as through its legislative, executive, or administrative branch of government." *Shelly v. Kraemer*, 334 U.S. 1, 15, 68 S.Ct. 836, 843 (1948).

C. *Sixth Amendment Right to Jury Trial*

Defendant further argues if the words "costs of prosecution" appearing in

---

[14] Rideau counsel further explained:

> This is not like a uni-bomber or Eric Rudolph, or one of these criminals that wants to use his crime as a means to make money to sell a book. And if that were to happen, I could well understand why the system would want him to pay back something. To the extent that anybody is interested in what he has to say, be it in a book or a movie or anything else where he can earn money is because of the fact, it's the redemptive factor, not the crime. Nobody's interested in the crimes he committed. They're interested in the what he's done since the crime. The rehabilitation that we say we want people to do.
>
> Pay back to society, redeem yourself, all of that is what he has done. That's what the story's about. And I just don't believe that the people of the State of Louisiana really want him to pay back for that. The one thing that this state has led the nation in is prison newspaper. Probably led the world in the prison newspaper that Wilbert Rideau put out, the documentaries, the books that he has written on prison reform. All of that was done to make up for what he–the crime that he had committed. And I just don't believe the people of the State of Louisiana want him to have to take, from whatever means he can get at 63 years of age, to try and save up his retirement. I don't believe the people of the state want him to pay back that money.
>
> I think they want that to be an example of what people can do if they want to try to redeem themselves. And I would hope that the Court simply would not make him pay that type of money. Thank you.

La.Code Crim.P. art. 887(A), which are automatically levied against a criminal defendant are broadly interpreted to include the kind and amount of costs assessed in this case, defendants constitutional right to a jury trial is seriously jeopardized. The United States and Louisiana Supreme Courts have declared that this right is fundamental and guaranteed by the Sixth Amendment to the United States Constitution and Article I, §19 of the Louisiana Constitution. See *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55 (1932); *Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444 (1968)*; State v. Muller*, 351 So.2d 143 (La.1977). Some courts have held the imposition of costs for the jury and trial security "can be a substantial deterrent to an exercise of the right to a jury trial" and "amounts to coercion and infringes a constitutional safeguard." *State v. Hanson*, 448 P.2d 758, 761 (Id. 1986); *Arnold v. State*, 306 P. 2d 368, 376 (Wyo. 1957).

## II.

### *INTERPRETATION*

### *"Costs of the Prosecution or Proceeding"*

We find persuasive the defense argument that the phrase "costs of prosecution or proceeding" as it appears in La.Code Crim.P. art. 887(A) does not express an intent by the legislature to authorize the recoupment of "every" costs incurred by the State in maintaining the judicial system. The Louisiana Supreme Court has said: "[I]f a statutory provision is susceptible of both a constitutional and an unconstitutional interpretation, it must be interpreted so that its constitutionality will be sustained. The legislature is presumed not to intend to enact an unconstitutional statute." *State v. LeCompte*, 406 So.2d 1300, 1307 (La.1981); *State v. Newton*, 328 So.2d 110 (La. 1976)(on rehearing). The courts of this state also have affirmed that words and phrases are to be assigned their "well known and commonly understood meaning." *State v. Richard*, 245 La. 465, 158 So.2d 828, 831 (La.1963). The legislature has in

other sections of La.Code Crim.P. art. 887 specifically provided for dollar amounts in particular cases to be taxed against criminal defendants as costs. *See* La.Code Crim.P. art 887 (B),(E),(H). None of the authorized costs, however, relate to those associated with impaneling, feeding, housing, and providing for the security and travel expenses of juries.

Despite Article 887(A)'s sweeping language, there are no reported cases, except one, in Louisiana where a criminal defendant has ever been taxed with "jury costs."[15] In *State v. Parker*, 436 So. 2d 495 (La.1983), the lone case on the subject, the Louisiana Supreme Court upheld a trial court's sentence condemning defendant to pay "all costs of this prosecution, including but not limited to clerk of court fee, *jury costs*, record preparation costs, and *any other costs* attributable to this prosecution." *Id*. at 499(emphasis added). The kinds and amounts of costs, however, were not fixed. The sole issue before the court focused on the propriety of the district court's assessment of all costs against the defendant for the first trial, which ended in a mistrial, and the second trial, which resulted in his conviction. While holding "it would be unfair to assess the defendant with the costs of the first trial," the court did not believe he should be totally exempt from costs associated with the second trial. *Id*. at 500. The court remanded the case for a redetermination of costs. Our research indicates no further disposition was entered in the matter following remand.

---

[15] We note, however, following Rideau's appeal, the trial court in *State v. Fussell*, 06-324 (La.App. 3 Cir. 9/27/06), ___So.2d __, ordered defendant "to pay all costs of this suit." He further stated "I'm directing the District Attorney to secure from the Clerk of Court, the Clerk's costs, to secure from the Sheriff the Sheriff's costs and to secure all other statutory fees and costs and to prepare a written judgment which will be filed into the mortgage records of LaSalle Parish. I'm also gonna order you to pay all restitution involved with respect to-if there is any–I order you to pay for any and all medical counseling and health expenses incurred by the victim or her family, as a consequence of your conviction for these offenses. That's also gonna be–it's an undetermined amount, it's just gonna be generally made in the judgment. I don't know what it's gonna be. I don't even know if the State's gonna make an application for that." Neither the amount of courts costs or restitution for medical and health costs to the victim or her family were specified at sentencing. We remanded the case for the fixing of an amount of restitution after finding the absence of this figure made the sentence indeterminate and thus illegal. Defendant did not appeal that portion of the court's order directing him to pay all costs.

19

Not only has Rideau been assessed with costs associated with the jury trial and other costs, the total amount of costs he has been ordered to pay is grossly disproportionate to any court costs ever imposed on any criminal defendant in this State, indigent or non-indigent, who has served the maximum term of imprisonment. In fact, in the 14th JDC, Calcasieu Parish, Louisiana, *no court costs* have ever been assessed against a defendant ordered to serve a maximum sentence. *See State v. Reeves,* docket no. 01-CR-020179; *State v. Langley,* docket no. 02-CR-010258; *State v. Hamilton*, docket no. 97-CR-015408. Like Rideau, both Reeves and Langley proceeded to trial as indigents and were represented by court appointed counsel. Hamilton was not indigent and was represented by retained counsel. Court costs were not assessed against Hamilton, Reeves, or Langley, but were assessed against Rideau.

Moreover, the defense contends, which has not been refuted by the State, that the 14th JDC customarily suspends court costs in serious non-capital felony cases as well. *See State v. Bonton*, docket no. 98-CR-010979 (manslaughter conviction); *State v.Porter*, docket no. 98-CR-010978 (second degree murder conviction); *State v. Jackson*, docket no. 01-CR-20083 (aggravated rape conviction); *State v. Fontenot*, docket no. 03-CR-022163 (second degree murder conviction); *State v. Withers*, docket no. 99-CR-005736 (second degree murder conviction); *State v. Schultz,* docket no. 97-CR-006435 (manslaughter conviction); *State v. West*, docket no. 99-CR-005725 (manslaughter and forcible rape convictions); *State v. East*, 96-CR-013588 (manslaughter conviction).

In assessing court costs in misdemeanor and lesser felony cases, the 14th JDC customarily follows a graduated fee schedule which is based on the type of charge and the cumulative number of charges. These fees are not arbitrary or subject to the discretion of the trial court, but rather are set in advance. For example, according to

the current schedule in Calcasieu Parish for a first DWI conviction, a defendant is required to pay as costs of court $196.00, while a fourth charge carries an assessment of $463.50. Costs for convictions of drug offenses carry assessments that range from $271.00 to $313.50. All other felonies, except drug offenses, are charged $173.50.

When court costs are imposed in felony convictions cases, these costs rarely exceed $1,500.00 and are for the payment of witness fees. *See State v. Henry*, docket no. 03-CR-020961 (possession of cocaine conviction, where the penalty imposed was a suspended three year sentence with three years of supervised probation, the court assessed costs of $813.50); *State v. Hesse*, docket no. 02-CR-019573 (unauthorized entry of an inhabited dwelling, the penalty imposed was a two year probated sentence with costs of $1,133.50); *State v. Mouton*, docket no. 03-CR-022183 (distribution of controlled narcotics convictions, penalty imposed was seven years with four years suspended, supervised probation and costs of $1163.50).

The record contains affidavits from public defenders and criminal defense attorneys practicing in judicial districts throughout the State. These attorneys attest to two facts: (1) the expenses associated with housing, feeding, transporting and providing trial security for a jury have never been assessed as costs to a criminal defendant; and, (2) when court costs are assessed against a criminal defendant, the costs rarely exceed $2,000.00.[16]

Moreover, other federal and state courts have held expenses associated with juries are costs inherent in the judicial process and are not ordinarily taxed as costs

---

[16] The record contains affidavits from the following: David E. Marcantel, Chief Public Defender, 31st Judicial District; M.Craig Colwart, Chief Public Defender,16th Judicial District; Michael A. Courteau, managing attorney, 4th Judicial District Indigent Defender Board; Richard M. Tompson, Chief Indigent Defender, 24th Judicial District; Alan J. Golden, Chief Counsel, Caddo Parish Public Defender's Office; Richard B. Stricks, public defender, St. John the Baptist Parish; Thomas Lorenzi, criminal defense attorney, 14th Judicial District; Walter M. Sanchez, criminal defense attorney,14th JDC; and, Charles C. St. Dizier, criminal defense attorney, 14th Judicial District, served five years with Calcasieu Parish Public Defender's Office.

against defendants, indigent or non-indigent. In *Gleckman v. United States*, 80 F.2d 394 (8th Cir. 1935), *cert. denied,* 297 U.S. 709, 56 S.Ct. 501 (1936), the defendant was convicted of income tax evasion and ordered to pay the costs of the prosecution in accordance with a federal statute authorizing the assessment of costs. The trial court taxed as costs jury fees, jury mileage, bailiffs' fees, jury meals and lodging, jury professional services, marshal's fees, and traveling and maintenance expenses incurred by the judge. These costs the court described as "expens[es] incurred by the government in providing a tribunal, that is, a judge and jury for the trial of the case." *Id.* at 403. The federal appellate court reversed the taxation of these items, stating:

> We do not find any authority for holding that such governmental expense can be taxed against one convicted of a criminal offense as "costs of the prosecution" in the absence of statute or established local practice. The expression "costs of prosecution" means such items of costs as are taxable by statute or by established practice or rule of court based on statute, and in the federal courts, where no federal statute is found to be directly applicable, recourse may sometimes be had to the statutes and practice of the state. It does not include the general expenses of maintaining the system of courts and the administration of justice, all of which is an ordinary burden of government. That the enumerated items could not be taxed as costs was expressly held in *United States v. Murphy* (D.C.) 59 F.(2d) 734, and we are satisfied with the conclusions concerning taxation of costs there indicted.

*Id.* at 403.(citations omitted). *See also Walden v. State*, 371 S.E.2d 852, 258 Ga. 503 (1988); *State v. Hanson,* 448 P.2d 758, 92 Id. 665 (1986); *State v. Ayala*, 95 N.M. 464 (N.M. Ct.App. 1981); *Arnold v. State*, 306 P.2d 368, 76 Wyo. 445 (1957); *United States v. Murphy*, 59 F.2d 734 (S.D. Al. 1932); *Gantt v. State*, 109 Md.App. 590, 675 A.2d 581 (Md. 1996). In *United States v. Ross*, 535 F.2d 346 (6th Cir. 1976), the appellate court vacated the trial court's order against a defense attorney for the costs incurred in assembling forty-two prospective jurors on the day the lawyer negligently failed to appear in court. Citing *Gleckman,* the court held there was no precedent for "taxing as costs the expenses of calling a jury in federal court." *Id.* at 350.

22

Other courts have found "the broad statutory authority to assess the 'costs of prosecution' against a convicted defendant [generally does not] include the authority to tax a defendant with jury expenses, on the theory that these are not costs of prosecution, but rather represent expenditures which must be made in order to maintain and operate the judicial system irrespective of specific violations of the law." *Gooch v. State*, 685 N.E.2d 152, 155 (Ind. Ct. App. 1997), citing *Mickler v. State*, 682 So.2d 607 (Fla. Dist. Ct. App. 1996).

**Other Constitutional Pitfalls**

Were we to interpret La.Code Crim.P. art. 887(A) as "all inclusive" of all prosecution costs of "whatever kind," as seemingly argued here, the potential for varied judicial interpretations of what costs fall within its perimeter is evident. It matters not that the statute on its face treats all defendants the same by automatically casting them with "costs of the prosecution or proceeding" upon conviction. A court could find that the costs of prosecution includes not only those associated with juries, but a laundry list of other costs from the date of arrest or citation to sentencing–i.e., security costs for judges, salaries of the sheriff, municipal police, or marshals and their deputies, transportation and incarceration costs, salaries of the clerk of court and his employees, in addition to record keeping and duplication costs, salaries of the judges, their law clerks, secretaries, and other court employees, including court reporters salaries and fees, salaries of the district attorney and his staff, and all their daily expenses while working on the "prosecution of the case" including the meals they consumed, the cost of traveling to and from their place of employment, all investigation expenses, forensic testing, all lay and expert witness costs and fees, in whatever amounts claimed, or any other costs the district attorney or other officials claim are related to the prosecution. Also, Article 887(A) does not expressly limit its

23

reach to include only felony cases. Defendants convicted of committing misdemeanors, for disobeying traffic signals, for example, are not immune from the assessment of the "costs of prosecution or proceeding," in addition to those fines and costs specifically regulated by statutes. In fact, the district attorney in brief points out Article 887(A) "applies regardless of the nature of the offense committed–any conviction invokes its operation." He argues a "notice requirement is conspicuously absent from the statute" and "there are no enumerated factors which a trial court must consider before assessing a defendant with costs."[17] He insists Article 887(A) "neither mentions or mandates trial court consideration of other cases and defendants, or court 'policy and practice' before a defendant is assessed costs."

When a statute is susceptible of being applied one way to one person, and a different way to another, the United States Supreme Court has held it is constitutionally vague.[18] Due process commands the even-handed treatment in the application and enforcement of laws. Further, the United States Supreme has held "'the touchstone of due process is protection of the individual against arbitrary action of government.'" *Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 665 (1986) citing *Dent v. West Virginia*, 129 U.S. 114, 123, 9 S.Ct. 231, 233 (1889). The Court also has affirmed that a statute which leaves sole discretion to the judge or jury whether to suspend its enforcement or not does not assure the exercise of "discretion in the legal sense of that term, but is granted to their mere will. It is purely arbitrary, and acknowledges neither guidance nor restraint." *Yick Wo. v. Hopkins*, 118 U.S. 356, 366-67, 6 S.Ct. 1064, 1069 (1886). The holding in *Giaccio v. Pennsylvania*, 382

---

[17] If the prosecutor's position is sound, the wife and children of a convicted felon could find themselves homeless from the sale of or burdened by a mortgage on the family's home or seizure of other assets without defendant receiving prior notice or opportunity to contest the specific amounts assessed or to claim "undue hardship" on himself or his family.

[18] Such a statute also may violate equal protection guarantees. *Niemotko v. Maryland*, 340 U.S. 268, 71 S.Ct. 325 (1951); *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064 (1886).

U.S. 399, 86 S.Ct. 518 (1966), provides a telling example of the United States Supreme Court's unequivocal stand in striking down such statutes on vagueness grounds. In *Giacco,* a Pennsylvania statute left to the discretion of the jury whether or not to assess costs against an acquitted criminal defendant. The statute did not provide any standards to guide the jury's determination. In finding the statute subjected criminal defendants to "arbitrary and discriminatory imposition of costs," the Court held:

> The Act, without imposing a single condition, limitation or contingency on a jury which has acquitted a defendant simply says the jurors 'shall determine, by their verdict, whether...the defendant, shall pay the costs'...Certainly one of the basic purposes of the Due Process Clause has always been to protect a person against having the Government impose burdens upon him except in accordance with the valid laws of the land. Implicit in this constitutional safeguard is the premise that the law must be one that carries an understandable meaning with legal standards that courts must enforce. This state Act as written does not even begin to meet this constitutional requirement.

*Id*. at 403, 86 S. Ct. at 521.

Due process also requires that the State implement procedures to make meaningful the available mechanism for judicial review. The exercise of discretion without any statutory standards, policy, custom, or prior jurisprudential guidance leaves an appellate court with little to review. In this case, for example, we have nothing in the record which might aid us in determining whether the costs, as itemized, accurately reflects the charges that were actually incurred in the prosecution of Rideau and whether those costs are reasonable. Therefore, any attempt by us to review the March 15, 2005 order for excessiveness is meaningless. Neither are we permitted, according to the prosecutor, to look at any other factors in determining whether the trial court abused its discretion by not suspending costs because none are provided in the statute.

Further, in protecting procedural due process, "[o]ur system of law has always endeavored to prevent even the probability of unfairness." *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 625 (1955). While the United States Supreme Court has not been willing to declare "every judgment rendered by an official who had a financial stake in the outcome of a case is *ipso facto* the product of bias,"[19] it has held due process is violated by any "procedure which would offer a possible temptation to the average man . . . not to hold the balance nice, clear, and true between the State and the accused." *Tumey v. Ohio*, 273 U.S. 510, 532, 47 S.Ct. 437, 444 (1927). We are particularly troubled in this case because of the unique position the trial court has been placed by the funding scheme adopted by the Parish of Calcasieu. The establishment of a Criminal Court Fund is authorized by La.R.S. 15:571.11(A)(1)(a) which provides in relevant part:

> All fines and forfeitures. . . shall be paid into the treasury of the parish in which the court is situated and deposited in a special 'Criminal Court Fund' account, which, on motion by the district attorney and approval order of the district judge, may be used or paid out in defraying the expenses of the criminal courts of the parish as provided in Ch.C. Articles 419 and 421 and R.S. 16.6, in defraying the expenses of those courts in recording and transcribing of testimony, statements, charges and other proceedings in the trial of indigent persons charged with the commission of felonies, in defraying their expenses in the preparation of records in appeals in such cases, for all expenses and fees of the petit jury and grand jury, for witness fees, for attendance fees of the sheriff and clerk of court, for costs and expenses of a parish law library, and for other expenses related to the judges of the criminal courts and the office of the district attorney. [20]

---

[19] *McGautha v. California*, 402 U.S. 183, 266, 91 S.Ct. 1454, 1497 (1971).

[20] This statute provides: "[O]n motion by the district attorney and approval order of the district judge, [the Criminal Court Fund] may be used or paid out in defraying the expenses of the criminal courts of the parish . . . in defraying the expenses of those courts in recording and transcribing of testimony, statements, charges, and other proceedings in the trial of indigent persons charged with the commission of felonies, in defraying their expenses in the preparation of records in appeals in such cases, for all expenses and fees of the petit jury and grand jury, for witness fees, for attendance fees of the sheriff and clerk of court, for costs and expenses of a parish law library, and for other expenses related to the judges of the criminal courts and the office of the district attorney." Louisiana also provides a fund for the payment of counsel who represent indigent

The Calcasieu Parish method of funding the criminal justice system is unique among the parishes in the State. In addition to the statutory fines and forfeitures mentioned in La.R.S. l5:571.11, Calcasieu Parish voters approved a tax which generates substantial income for the Criminal Court Fund in that parish. The method was detailed by the Louisiana Supreme Court in *State v. Citizen*, 04-1841, p.3 (La. 4/1/05), 898 So.2d 325, 328 as follows:

> [I]n 1985. . . [the] voters in the parish approved an *ad valorem* tax specifically dedicated to maintaining the Criminal Court Fund, established pursuant to La.R.S. 15:571.11(A). Voters renewed the tax in 1995 and will consider it again in 2005. As explained by the parish attorney, this system has clearly been an overwhelming success. Using the figures from the last fiscal year, the attorney explained that in 2000, the tax, as supplemented by fines and forfeitures, put into the Criminal Court Fund $3,500,000, by far the largest portion of the total amount of $5,300,000, which also included funds from other sources such as grant programs. By agreement, 20% of the Fund portion generated by the *ad valorem* tax and fines and forfeitures goes into the witness and juror fee account, 60% to the D.A.'s office, and 40% to the district courts. Any surplus remaining in the witness and jury fee account at the end of the year does not revert to the general parish fund, but is split on a 50/50 basis between the courts and the D.A.'s office. In 2000, that surplus amounted to some $440,000.00, an average figure over a seven year period. Counsel for the CPPJ [Calcasieu Parish Police Jury] further explained that his client would not mind allocating a portion of these funds for capital defense, but could not do so without the agreement of both the 14th J.D.C. and the Calcasieu Parish District Attorney.

What is apparent from reading *Citizen*, as well as the transcript of the motion hearing in this case, is the trial court, along with the district attorney, manage and control the Criminal Court Fund to a great extent in Calcasieu Parish. In this case, the trial court paid the expenses related to the jury from the funds it jointly controlled with the District Attorney, and it agreed to loan the Indigent Defender Board funds

---

defendants. Louisiana Revised Statutes 15:146(a) provides, in relevant part: "There is hereby created within each judicial district an indigent defender fund which shall be administered by the district board and composed of funds provided for by this Section and such funds as may be appropriated or otherwise made available to it." The Judicial Expense Fund for the 14th JDC is authorized by La.R.S. 13:996.9. *This statute provides upon conviction, a defendant shall be taxed a sum not to exceed $5.00 which will be deposited in the Judicial Expense Fund.*

to provide for Rideau's defense, although the judge disputes that he and his colleague judges agreed to advance a certain amount without prior approval. The court stated:

THE COURT:　　And let me say this too, the – what I have –what I ordered to be assessed as court costs was significantly less than what this trial actually cost also.  I – in other words, I didn't include all the – I have no idea how much the D.A.'s Office spent, but I'm sure that it was probably more than what I assessed just from the actual Court's expenses.  *And what I assessed is what the Court itself actually had to spend in the prosecution of this case.*
I didn't – I didn't even go, I mean, in other words, *I wasn't trying to rack up a huge bill for Mr. Rideau.  But, you know, the Court's budget isn't flushed with a lot of money.  As a matter of fact, we've been in the red in our court budget the last couple of years* for various reasons, because of trials like this, because of trials like Jason Reeves and Ricky Langley.  And these cases cost a lot of money.  And –

MR. KENDALL:　Well, Your Honor, we realize that, and that's one of the reasons why we wanted to settle this case.  And it – that did not – that's not our fault that we had to have a trial in this case.  We were willing to sit down, and if there's any way to settle this case, let's settle this case.  It just didn't happen.

THE COURT:　　I don't determine the amount generally speaking.  The Sheriff keeps up with all those figures.  *The reason that I issued the specific order in this case because the Sheriff didn't write all the checks for the expenses that occurred; the Court did.  So I had that list compiled just so that we could make sure we had an accurate listing of what the Court had incurred as costs in this case.*

The judge explained the costs he assessed Rideau were those "the Court itself actually had to spend in the prosecution of this case."   The inherent danger in allowing courts or judicial officers to have a stake in the costs collected from defendants was recognized long ago by the framers of this State's 1898 Constitution. In *State ex rel. Babin v. Foster*, 109 La. 587, 590-91, 33 So. 611, 613 (La. 1903), the Louisiana Supreme Court noted:

Prior to the adoption of the Constitution of 1898 the law was that parties placed under peace bonds should, in addition to giving the bond*, pay the costs of the proceedings* taken to compel the giving of the bond. Rev. St.§1046; Act No. 121 of 1855.

And a party required to give a peace bond could lawfully be committed to prison in default of giving the bond and paying the costs.

*To put an end to abuses originating in this law*, viz:--its too frequent application under the stimulus of the costs to accrue therefrom--the constitutional convention adopted article 128.

Under its terms, in lieu of the old system of costs exacted of those put under peace bonds, the police juries of the parishes are to compensate justices of the peace and the constables of their courts directly out of the parochial treasury for services in such cases.

It is the duty of the police juries to make provision[s] for this. *But whether they do or not, the constitutional inhibition applies;--justices of the peace and constables are to receive no fees (i.e.--costs) in criminal matters and peace bond cases.* (emphasis added.)

## III.

## STANDING

We find in this case neither the Louisiana legislature nor the State constitution grants the trial judge legal standing to seek the costs, *on behalf of the Court*, which he ordered Rideau to pay in the March 15, 2005 Order. Louisiana Code of Criminal Procedure Article 887(A) clearly provides "such costs are recoverable by the *party or parties who incurred* the expense." Louisiana Revised Statutes 15:304 provides:

All expenses incurred in the different parishes of the state or in the city of New Orleans by the arrest, confinement, and prosecution of persons accused or convicted of crimes, their removal to prison, the pay of witnesses specifically provide for by law, jurors and all prosecutorial expenses whatever attending criminal proceedings shall be paid by the respective parishes which the offense charged may have been committed or by the city of New Orleans, as the case may be. The expenses shall be paid by the parish treasurer or by the city of New Orleans after an account of the expenses shall be duly certified to be correct by the presiding judge and the clerk of court. *The fees, salaries, and expenses to be paid shall be fixed and regulated by the parish or city authority unless otherwise provided by law.* . . . Nothing in this Section shall be construed to make the parishes or the city of New Orleans responsible for the expenses associated with the costs, expert fees, or attorney fees of a defendant in a criminal proceeding. (emphasis added.)

It is true the court may have a beneficiary interest in the Criminal Court Fund established by "some local agreement or custom in Calcasieu Parish," but this does not change the fact that all "prosecutorial expense whatever attending criminal

29

proceedings shall be paid by the respective parish," as provided in La.R.S. l5:304, from a special Criminal Court Fund, derived from fines and forfeitures, "paid into the treasury of the parish." And the "*fees, salaries, and expenses to be paid shall be fixed and regulated by the parish or city authority unless otherwise provided by law*." La. R.S. l5:304 (emphasis added). Thus, the real party in interest, with standing to collect and with statutory authority to pay the expenses for the prosecution in this case, was Calcasieu Parish. Yet, the Parish, through its legally designated representative, made no appearance in this proceeding, filed no claim for payment with the court, and presented no documents showing the fixed "fees and expenses" it authorized and did, in fact, incur in this case. We note, as well, the Sheriffs of Calcasieu and Ouachita Parishes made no appearances in this matter and there are no documents in the record to establish that the sums listed as "advance costs" were in fact paid to them and expended by them for services or expenses. The Clerk of Court also made no appearance and filed no claim. The prosecutor was present, but it was clear, he was not the party seeking reimbursement. He stated:

> First of all, I don't consider this part of this being as opposed to everything else that's preceded this necessarily an adversarial proceeding. This is an order that the Court has imposed. We have responded in writing and I'll stand by our response. And I'm simply here at this point to refute anything that I deem as a misstatement.

The prosecutor acknowledges in brief that "the costs order . . . seeks to reimburse the *parish* for costs expended in this proceeding." [21] It is the Parish then that must seek

---

[21] In some instances, the district attorney represents the parish. However, the district attorney did not express that his appearance in this case was on behalf of the parish. Even if he had done so, Justice Calogero has made clear that he cannot do so in this case. In *State v. Touchet,* 93-2839 (La. 9/6/94), 642 So.2d 1213, Justice Calogero stated that "[i]n those parishes where the District Attorney is also the parish attorney, the prosecution must not be permitted to represent the entity objecting to the defendant's request. . . . The constitutional guarantees to which an individual defendant is entitled, compel a finding that in parishes where the District Attorney is also the parish attorney, or otherwise represents the parish's governing authority, that governing authority cannot be represented by the District Attorney or his or her assistants who also engage in the private practice of law. Thus, only attorneys having no connection [with] the Office of District Attorney should represent a governing body and/or agency in challenging need or costs." *Id.* at 1227, (Calogero, C.J., concurring). Because of the funding scheme unique in Calcasieu Parish, in this case, the trial court's

to recover the "prosecution costs" it was statutorily obligated to pay and incurred in Rideau's case.

<h2 style="text-align:center">INDIGENT DEFENSE COSTS</h2>

In addition to court costs, the trial court ordered Rideau to "reimburse the Indigent Defender's Board for all costs associated with his defense, including witness fees and expenses." We surmise from the hearing, the Indigent Defender's Board (IDB) has not advanced any funds for Rideau's defense. Private counsel provided funds for the investigation and defense of Rideau which, according to the record, far exceeded the $67,000.00 they are seeking to recoup from the IDB.[22] The record reflects, the trial court, prior to trial, expressed intent to advance funds to the IDB for Rideau's defense. The following exchange occurred between the trial court and defense counsel at the hearing:

MR. KENDALL: Your Honor, as the Court knows, the Indigent Defender Board has not paid out any money in this case. Mr. Rideau's counsel had to fund this case. It's funded it from its duration since

---

decision to withhold funds previously committed to the IDB for Rideau's defense may result in a financial surplus in the witness and jury fee expense account. This surplus, by prior agreement, would then be divided between the district attorney and the district court. The evil in *Touchet* which threatened a defendant's right to a fair trial, that Justice Calogero indicated must be avoided, was that the district attorney may acquire an unfair evidentiary advantage. Here the district attorney may acquire an unfair financial advantage to the detriment of a defendant's right to adequate counsel and a defense counsel's right for reimbursement of reasonable expenses.

[22] Rideau's counsel points out "[t]he defense team did not seek reimbursement for at least $100,000 in counsel fees, and another $100,000 in litigation costs, and sought reimbursement for only those services that were tied directly to the presentation of its trial defense." As he explained at the hearing, "And, [Mr. Murray] had every right to submit a request for roughly $100,000.00 in fees. He chose not to. I can tell you that my law firm has spent more than $100,000.00 in expenses and costs which we've not sought any reimbursement on whatsoever. And then that does not count; that was out-of-pocket expenses. That does not count my time for the last five years now and the time of the several other lawyers who had to come in the case to aid us so that we could handle this case properly. *So there was a huge contribution made by the private bar in this case to see that this case was done appropriately, which Calcasieu Parish, the 14th JDC is not going to ever have to be–have to pay for.*" In *State v. Wigley*, 624 So.2d 425 (La.1993), the supreme court held "To require that attorneys represent indigents with no recompense while bearing the expenses of the representation, when the attorneys must maintain their own practices and continue to meet their other professional and financial obligations in today's changed legal marketplace, 'is so onerous that it constitutes an abusive extension of their professional obligations'" *Id.* at. 428-29. In this case, although there was a prior agreement with the trial court to advance money to the IDB for Rideau's defense, this was never done. Now the court is requiring Rideau's defense counsel to bear their own out-of-pocket expenses until such time as Rideau "writes a book or gets a movie deal."

they've been back here. We received assurances that there was – there were funds in this – in the budget to pay for two capital cases that were going to be tried last year, the Reeves case and the Rideau case. And here we are now seven months after trial and --

THE COURT: Well, let me say this. You know, as far as that goes, we didn't tell you there was just money sitting there that didn't have any place to be spent that – that was just waiting to be, you know, that we just had this extra money sitting somewhere. I told you that we had – we would make that a priority. We would make sure that there were funds available to make sure this case got tried. And, you know, and – and also on that note, I mean, y'all – we had an –well, I've told y'all, and we had an understanding, because I said that – we had an understanding, because I said that – we discussed it on more than one occasion that you needed to provide – I told you that after meeting with the other judges, the way we were handling these matters, the way Judge Canaday was handling the Reeves case, and in order to keep the costs under control, that we needed to approve the costs before they were incurred. And you told me that you thought it was going to cost about 35 to 40 thousand dollars in expert witness fees or whatever you needed to have the – to provide a defense for Mr. Rideau. And I told you, and I presented that figure to the – to the other judges and I was – but I told you that I still needed to know what those costs were going to be and approve those costs. The only thing that was ever provided to me in advance before I got that huge bill after the trial was over was the – the investigative stuff that y'all had to do in response to the first trial date that was fixed fairly quickly. Y'all hired some firm to go out and y'all spent about $20,000.00, as I recall, on a firm to come down and do some research and try to prepare for a change of venue hearing. And that was done – and that was provided to me after the fact. And I told you that I wanted a more detailed statement which –which it took some time to get. And anyway, but that's the only thing that I received and approved of.
. . . .

THE COURT: And frankly, the part that I ordered the reimbursement for the Public Defender's Office and the Indigent Defender Board, if they haven't paid anything, then obviously, there's no reimbursement owed there. But I know – I do know that there was an issue the Court has not yet – because the Court had agreed to advance that money, the Court was going to advance it to the Indigent Defender board and who, in turn, was going to reimburse the Court for that.
That was the – that was the agreement. That hasn't been done yet. And because of that agreement that's why I order that the – that Mr. Rideau reimburse the Indigent Defender Board for the experts.

We are convinced the legislature did not grant the trial judge legal authority to issue a judgment ordering Rideau, *who is still indigent,* to reimburse the IDB for the costs of his defense and expenses.

Louisiana Revised Statutes 15:148,[23] deals specifically with reimbursement by indigents of defense and other costs. This statute provides, in relevant part:

>A. To the extent that a person is financially able to provide for an attorney, other necessary services and facilities of representation and court costs, the court shall order him to pay for these items. The court may order payment in installments, or in any manner which it believes reasonable and compatible with the defendant's financial ability.

>B.(1) Payments so made shall be transmitted to and become a part of the indigent defender fund of the district in which the person is prosecuted.

>C. (1) When an accused is initially determined to be indigent and appointed counsel but subsequently hires private counsel, the court shall conduct a contradictory hearing to determine the expenses of representing the accused incurred by the indigent defender board. Upon determining the expenses incurred, the accused shall, within the discretion of the court, be liable to reimburse the board those expenses, upon a determination that the accused *was in fact not initially indigent . . . .* (emphasis added.)

The provision obviously envisions that a determination of indigent status and ability of a defendant to contribute to the cost of his defense, including "court costs," will occur at the time appointment of counsel is requested. To the extent a defendant

---

[23] This provision is contained in the section entitled "Right to Counsel." Our legislature clearly recognized the potential burden on a defendant's right to counsel, if an indigent was automatically assessed with defense fees, regardless of his indigent status or hardship. Although the trial court agreed to loan the IDB funds to pay for Rideau's defense expenses, it has not done so. The IDB has not been able to reimburse Rideau's counsel for expenses which the trial judge acknowledged at the hearing were reasonable, though he argued the court had not approved "some of the expenses" before they were incurred. When defense counsel, in closing, again reminded the trial judge that the amount assessed Rideau was extraordinary, the judge stated:

>[I]t's not going to take all of this money. And frankly, the part that I ordered the reimbursement for the Public Defender's Office and the Indigent Defender Board, if they haven't paid anything, then obviously, there's no reimbursement owed there. But I know–I do know that there was an issue the Court has not yet–because the Court had agreed to advance that money, the Court was going to advance it to the Indigent Defender Board and who, in turn, was going to reimburse the Court for that.

>*That was the–that was the agreement. That hasn't been done yet. And because of that agreement that's why I ordered that the–that Mr. Rideau reimburse the Indigent Defender Board for the experts.*

33

is judged financially able to pay a portion of the defense expenses and court costs, the court is directed to issue an order requiring him to pay in installments or any other manner compatible with the defendant's financial ability to pay. The only other instance mentioned in the statute where a trial court is authorized, within its discretion after a contradictory hearing, to issue a judgment ordering a defendant to pay defense and court costs occurs when he hires private counsel after the appointment of indigent counsel and the court "determines that the accused was in fact *not initially* indigent."

Accordingly, we find the trial court was not authorized to issue a judgment directing Rideau to reimburse the IDB for the costs associated with his defense, including expert witness fees and expenses. Rideau, at all relevant times, even up to the date of his sentence, was indigent–a fact which is undisputed in the record. Louisiana Revised Statutes 15:148 does not provide for an assessment of defense costs and other expenses against a defendant who was *initially indigent* but may rid himself of that status following release from prison.[24]

**DECREE**

Accordingly, we hereby grant Rideau's motion and vacate the Order of March 15, 2005 compelling him to pay all court costs related to the trial as itemized in Exhibit A and to reimburse the Indigent Defender Board all costs associated with his defense, including expert witness fees and expenses. The trial court retains authority to enforce Rideau's January 15, 2005 sentence requiring that he pay "all court costs associated with these proceedings," consistent with this court's opinion and the Constitutions of Louisiana and the United States.

**ORDER VACATED.**

---

[24] We note, as well, the Indigent Defender's Board, *the real party in interest*, has not sought to recoup any costs of defense or other fees from Rideau.

# EXHIBIT A

| | EXPENSES - WILBERT RIDEAU JANUARY 3- JANUARY 15, 2005 TRIAL 015321-01 | |
|---|---|---|
| Date | Vendor | Amount |
| 12/29/04 | Office Depot | $37.69 |
| 01/03/05 | Ouachita Parish (advance deposit) | $15,015.90 |
| 01/09/05 | Piccadilly | $186.32 |
| 01/09/05 | Pat's of Henderson | $359.49 |
| 01/10/05 | Holiday Inn (Monroe) | $3,622.13 |
| 01/10/05 | Ruby Tuesday | $364.03 |
| 01/10/05 | Ms. Dee | $53.25 |
| 01/10/05 | Pappys | $129.60 |
| 01/11/05 | Sam's | $33.94 |
| 01/11/05 | Johnny Carinos | $378.33 |
| 01/11/05 | Tony's | $157.02 |
| 01/11/05 | Ms. Dee | $49.50 |
| 01/12/05 | Ms. Dee | $18.00 |
| 01/12/05 | Pronia's | $100.50 |
| 01/12/05 | Harlequin | $433.11 |
| 01/13/05 | Steamboat Bill's | $396.90 |
| 01/13/05 | Tony's | $174.00 |
| 01/13/05 | Ms. Dee | $28.00 |
| 01/14/05 | Pam Allee | $193.75 |
| 01/14/05 | Judge David Ritchie | $324.36 |
| 01/14/05 | Kay Miller | $318.62 |
| 01/14/05 | Heath Dorsey | $324.36 |
| 01/14/05 | Elizabeth Surles | $155.00 |
| 01/14/05 | Patricia Hanks | $307.28 |

Page 1 of 2

35

| Date | Vendor | Amount |
|---|---|---|
| | EXPENSES - WILBERT RIDEAU<br>JANUARY 3- JANUARY 15, 2005 TRIAL<br>015321-01 | |
| 01/14/05 | Chris Hinton | $307.28 |
| 01/14/05 | Wayne Day | $193.75 |
| 01/14/05 | Pappy's | $124.80 |
| 01/14/05 | Seafood Palace | $435.68 |
| 01/14/05 | Ms. Dee | $36.00 |
| 01/15/05 | Tony's (staff) | $24.00 |
| 01/15/05 | Ruby Tuesday | $312.66 |
| 01/15/05 | Ms. Dee | $51.60 |
| 01/15/05 | Tony's | $247.98 |
| 01/16/05 | Super Stop #26 | $70.71 |
| 01/18/05 | Wayne Day (out of pocket expenses) | $42.50 |
| 01/20/05 | Best Suites | $16,874.33 |
| 01/20/05 | McFillen | $1,953.85 |
| 01/20/05 | Denise Savant (reimbursement of expenses) | $4.26 |
| 02/01/05 | Sir Speedy (Copies of jury questionnaires) | $1,241.70 |
| 02/14/05 | Calcasieu Parish Sheriff's Office | $12,432.77 |
| 02/10/05 | Unishippers | $24.50 |
| 02/12/05 | Mayo Tours | $2,116.00 |
| 03/08/05 | Witness Fee - Gary Shannon | $1,000.00 |
| 03/08/05 | Witness Fee - Cat Oubre | $250.00 |
| | | $60,905.45 |
| | | |
| | | |

Page 2 of 2

36

# EXHIBIT B

## COSTS ASSOCIATED WITH JURY

*Costs Associated with Sequestered Jury from Ouachita Parish*

| Type of Expense | Date | Vendor | Amount |
|---|---|---|---|
| Supplies | 12/29/04 | Office Depot | $37.69 |
| | 2/10/05 | Unishippers | $24.50 |
| Meals | 1/09/05 | Piccadilly | $186.32 |
| | 1/09/05 | Pat's of Henderson | $359.49 |
| | 1/10/05 | Ruby Tuesday | $364.03 |
| | 1/10/05 | Ms. Dee | $53.25 |
| | 1/10/05 | Pappys | $129.60 |
| | 1/11/05 | Sam's | $33.94 |
| | 1/11/05 | Johnny Carinos | $378.33 |
| | 1/11/05 | Tony's | $157.02 |
| | 1/11/05 | Ms. Dee | $49.50 |
| | 1/12/05 | Ms. Dee | $18.00 |
| | 1/12/05 | Pronia's | $100.50 |
| | 1/12/05 | Harlequin | $433.11 |
| | 1/13/05 | Steamboat bill's | $396.90 |
| | 1/13/05 | Tony's | $174.00 |
| | 1/13/05 | Ms. Dee | $28.00 |
| | 1/14/05 | Pappy's | $124.80 |
| | 1/14/05 | Seafood Palace | $435.68 |
| | 1/14/05 | Ms. Dee | $36.00 |
| | 1/15/05 | Ruby Tuesday | $312.66 |
| | 1/15/05 | Ms. Dee | $51.60 |
| | 1/15/05 | Tony's | $247.98 |
| | 1/16/05 | Super Stop #26 | $70.71 |
| Lodging | 1/20/05 | Best Suites | $16,874.33 |
| Jury Questionnaire | 2/01/05 | Sir Speedy (copies of jury questionnaire) | $1,241.70 |
| Transportation | 2/12/05 | Mayo Tours | $2,116.00 |

SUBTOTAL $24,435.64

37

*Costs Associated with Calcasieu Parish Court Staff During Jury Selection in Ouachita Parish*

| Type of Expense | Date | Vendor | Amount |
|---|---|---|---|
| Court Marshals | 1/14/05 | Pam Allee | $193.75 |
| | 1/14/05 | Wayne Day | $193.75 |
| | 1/18/05 | Wayne Day (out of pocket expenses) | $42.50 |
| Lodging in Monroe | 1/10/05 | Holiday Inn (Monroe) | $3,622.13 |
| Staff Costs | 1/14/05 | Judge David Ritchie | $324.36 |
| | 1/14/05 | Kay Miller | $318.62 |
| | 1/14/05 | Heath Dorsey | $324.36 |
| | 1/14/05 | Elizabeth Surles | $155.00 |
| | 1/14/05 | Patricia Hanks | $307.28 |
| | 1/14/05 | Chris Hinton | $307.28 |
| | 1/15/05 | Tony's (staff) | $24.00 |
| Unknown | 1/20/05 | McFillen | $1,953.85 |
| | 1/20/05 | Denise Savant (reimbursement of expenses) | $4.26 |

SUBTOTAL $7,771.14

## COSTS ASSOCIATED WITH TRIAL SECURITY

| Type of Expense | Date | Vendor | Amount |
|---|---|---|---|
| Ouachita Parish | 1/03/05 | Ouachita Parish (advance deposit) | $15,015.90 |
| Sheriff's Office | 2/14/05 | Calcasieu Parish Sheriff's Office | $12,432.77 |

SUBTOTAL $27,448.67

## COSTS ASSOCIATED WITH WITNESS FEES

| Type of Expense | Date | Vendor | Amount |
|---|---|---|---|
| Witness Fees | 3/08/05 | Witness Fee - Gary Shannon | $1,000.00 |
| | 3/08/05 | Witness Fee - Cat Oubre | $250.00 |

SUBTOTAL $1,250.00

**SUBTOTALS**

Jury:              $24,435.64
Court Staff:       $ 7,771.14
Trial Security:    $27,448.67
Witness Fees:      $ 1,250.00
TOTAL:             $60,905.45